ARDESTANI *v.* IMMIGRATION AND NATURALIZA-
TION SERVICE

No. 90–1141.   Argued October 8, 1991—Decided December 10, 1991

O'CONNOR, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, SCALIA, KENNEDY, and SOUTER, JJ., joined. BLACK-MUN, J., filed a dissenting opinion, in which STEVENS, J., joined, *post*, p. 139. THOMAS, J., took no part in the consideration or decision of the case.

*David N. Soloway* argued the cause for petitioner. With him on the briefs was *Carolyn F. Soloway.*

*Deputy Solicitor General Wallace* argued the cause for respondent. With him on the brief were *Solicitor General Starr, Assistant Attorney General Gerson, Harriet S. Shapiro, William Kanter,* and *John S. Koppel.*\*

*\*Lawrence H. Rudnick* filed a brief for the American Immigration Lawyers Association as *amicus curiae* urging reversal.

*John J. Curtin, Jr., Robert E. Juceam, Dale M. Schwartz,* and *Sandra M. Lipsman* filed a brief for the American Bar Association as *amicus curiae.*

JUSTICE O'CONNOR delivered the opinion of the Court.

Petitioner Rafeh-Rafie Ardestani prevailed in an administrative deportation proceeding brought by respondent Immigration and Naturalization Service (INS). She sought attorney's fees and costs under the Equal Access to Justice Act (EAJA), 5 U. S. C. § 504 and 28 U. S. C. § 2412, which provides that prevailing parties in certain adversarial proceedings may recover attorney's fees from the Government. We now consider whether the EAJA authorizes the award of attorney's fees and costs for administrative deportation proceedings before the INS. We conclude that it does not.

## I

Ardestani is an Iranian woman of the Bahai faith who entered the United States as a visitor in December 1982. She remained in this country lawfully until the end of May 1984 and then sought asylum. The United States Department of State informed the INS that Ardestani's fear of persecution upon return to Iran was well founded. In February 1986, however, the INS denied Ardestani's asylum application on the ground that, before entering the United States, she had reached a "safe haven" in Luxembourg and had established residence there. Ardestani advised the INS that she had been in Luxembourg only three days en route to the United States, that she had stayed in a hotel, and that she had never applied for residency in that country. Nonetheless, the following month, the INS issued an order to show cause why she should not be deported.

At the deportation hearing, Ardestani successfully renewed her application for asylum. She then applied for attorney's fees and costs under the EAJA. The Immigration Judge awarded attorney's fees in the amount of $1,071.85 based on his determination that Ardestani was the "prevailing party" in the adjudication and that the position of the INS in pursuing her deportation was not "substantially justified." The INS appealed the award of fees to the Board of Immigration Appeals. The Board vacated and denied the

award on the ground that the Attorney General has determined that deportation proceedings are not within the scope of the EAJA. See 28 CFR § 24.103 (1991); 46 Fed. Reg. 48921, 48922 (1981) (interim rule). A divided Court of Appeals for the Eleventh Circuit denied Ardestani's petition for review and held that the EAJA does not apply to administrative deportation proceedings. 904 F. 2d 1505 (1990).

We granted certiorari, 499 U. S. 904 (1991), to resolve a conflict among the United States Courts of Appeals[1] and now affirm.

## II

The EAJA provides that prevailing parties in certain adversary administrative proceedings may recover attorney's fees and costs from the Government. In pertinent part, 5 U. S. C. § 504(a)(1) provides that "[a]n agency that conducts an adversary adjudication shall award, to a prevailing party other than the United States, fees and other expenses incurred by that party in connection with that proceeding, unless the adjudicative officer of the agency finds that the position of the agency was substantially justified or that special circumstances make an award unjust." The EAJA defines an "adversary adjudication" as "an adjudication under section 554 of this title in which the position of the United States is represented by counsel or otherwise." 5 U. S. C. § 504(b)(1)(C)(i). Section 554 of Title 5, in turn, delineates

---

[1] Five other Courts of Appeals agree with the court below that the EAJA does not apply to administrative deportation proceedings. *Hashim* v. *INS*, 936 F. 2d 711 (CA2 1991), cert. pending, No. 91–207; *Escobar* v. *INS*, 935 F. 2d 650 (CA4 1991); *Hodge* v. *United States Dept. of Justice*, 929 F. 2d 153 (CA5 1991), cert. pending, No. 91–83; *Full Gospel Portland Church* v. *Thornburgh*, 288 U. S. App. D. C. 356, 927 F. 2d 628 (1991), cert. pending, No. 91–494; *Clarke* v. *INS*, 904 F. 2d 172 (CA3 1990); accord, *Owen* v. *Brock*, 860 F. 2d 1363 (CA6 1988) (using similar analysis to hold that Federal Employees Compensation Act benefit determinations are not covered by the EAJA). The Court of Appeals for the Ninth Circuit has determined that administrative deportation proceedings are within the scope of the EAJA. *Escobar Ruiz* v. *INS*, 838 F. 2d 1020 (1988) (en banc).

the scope of proceedings governed by the formal adjudication requirements of the Administrative Procedure Act (APA), see 5 U. S. C. §§ 556, 557, and sets forth some of those requirements. As both parties agree that the United States was represented by counsel in Ardestani's deportation proceeding, the sole question presented in this case is whether that proceeding was an adversary adjudication "under section 554" within the meaning of the EAJA.

A

Section 554(a) states that the provisions of that section apply to "every case of adjudication required by statute to be determined on the record after opportunity for an agency hearing," with six statutory exceptions not relevant here. Subsections (b) through (e) of § 554 establish the procedures that must be followed in the agency adjudications described in subsection (a). Although immigration proceedings are required by statute to be determined on the record after a hearing, 8 U. S. C. § 1252(b), we previously have decided that they are not governed by the APA. *Marcello* v. *Bonds*, 349 U. S. 302 (1955).

In *Marcello*, we held that Congress intended the provisions of the Immigration and Nationality Act of 1952 (INA), 66 Stat. 163, as amended, 8 U. S. C. § 1101 *et seq.*, to supplant the APA in immigration proceedings. Two years before the enactment of the INA, we had concluded that immigration proceedings *were* subject to the APA. *Wong Yang Sung* v. *McGrath*, 339 U. S. 33 (1950). Congress legislatively overruled that decision almost immediately afterward in a rider to the Supplemental Appropriation Act, 1951. 64 Stat. 1044, 1048. In *Marcello*, we had to determine whether, in revising the immigration laws in 1952 and repealing the rider, Congress had reversed its previous position and reinstated the holding of the *Wong Yang Sung* case. We held that the INA "expressly supersedes" the hearing provisions of the APA in light of "the background of the 1952 immigration

legislation, its laborious adaptation of the Administrative Procedure Act to the deportation process, the specific points at which deviations from the Administrative Procedure Act were made, the recognition in the legislative history of this adaptive technique and of the particular deviations, and the direction in the statute that the methods therein prescribed shall be the sole and exclusive procedure for deportation proceedings." 349 U. S., at 310.

Applying our precedent in *Marcello*, it is clear that Ardestani's deportation proceeding was not subject to the APA and thus not governed by the provisions of § 554. It is immaterial that the Attorney General in 1983 promulgated regulations that conform deportation hearings more closely to the procedures required for formal adjudication under the APA. 48 Fed. Reg. 8038–8040 (1983). *Marcello* does not hold simply that deportation proceedings are subject to the APA except for specific deviations sanctioned by the INA. Rather, *Marcello* rests in large part on the statute's prescription that the INA "shall be the *sole* and *exclusive* procedure for determining the deportability of an alien under this section." INA, § 242(b) (codified at 8 U. S. C. § 1252(b)) (emphasis added); *Marcello, supra,* at 309. Neither the analysis nor the decision in *Marcello* leaves open the possibility that the APA should displace the INA in the event that the regulations governing immigration proceedings become functionally equivalent to the procedures mandated for adjudications governed by § 554.

B

Ardestani's principal argument is that, for the purposes of the EAJA, deportation proceedings fall "under section 554" because, like the adjudications described in § 554(a), they are "required by statute to be determined on the record after opportunity for an agency hearing." She thus contends that the phrase "under section 554" encompasses all adjudications "as defined in" § 554(a), even if they are not governed by the procedural provisions established in the remainder of that

section. We hold that the meaning of "an adjudication under section 554" is unambiguous in the context of the EAJA and does not permit the reading that Ardestani has urged upon us.

"The starting point in statutory interpretation is 'the language [of the statute] itself.'" *United States* v. *James,* 478 U. S. 597, 604 (1986) (quoting *Blue Chip Stamps* v. *Manor Drug Stores,* 421 U. S. 723, 756 (1975) (Powell, J., concurring)). The word "under" has many dictionary definitions and must draw its meaning from its context. In this case, the most natural reading of the EAJA's applicability to adjudications "under section 554" is that those proceedings must be "subject to" or "governed by" § 554. Indeed, in addition to the court below, six United States Courts of Appeals have determined that the plain and ordinary meaning of "under" as it appears in the EAJA is that proceedings must be governed by the procedures mandated by the APA. See the cases cited in n. 1, *supra.* As one court has observed, the word "under" appears several times in the EAJA itself, and "[i]n other locations, no creative reading is possible—'under' means 'subject [or pursuant] to' or 'by reason of the authority of.'" *St. Louis Fuel & Supply Co.* v. *FERC,* 281 U. S. App. D. C. 329, 333, 890 F. 2d 446, 450 (1989).[2]

The "strong presumption" that the plain language of the statute expresses congressional intent is rebutted only in "rare and exceptional circumstances," *Rubin* v. *United States,* 449 U. S. 424, 430 (1981), when a contrary legislative

---

[2] *E. g.,* 5 U. S. C. § 504(a)(2) ("A party seeking an award of fees and other expenses shall, within thirty days of a final disposition in the adversary adjudication, submit to the agency an application which shows that the party is a prevailing party and is eligible to receive an award *under* this section . . ."); § 504(c)(2) ("If a party other than the United States is dissatisfied with a determination of fees and other expenses made *under* subsection (a) . . ."); § 504(d) ("Fees and other expenses awarded *under* this subsection shall be paid by any agency over which the party prevails from any funds made available to the agency by appropriation or otherwise") (emphases added).

intent is clearly expressed. *INS* v. *Cardoza-Fonseca,* 480 U. S. 421, 432, n. 12 (1987); *Consumer Product Safety Comm'n* v. *GTE Sylvania, Inc.,* 447 U. S. 102, 108 (1980). In this case, the legislative history cannot overcome the strong presumption " 'that the legislative purpose is expressed by the ordinary meaning of the words used.' " *American Tobacco Co.* v. *Patterson,* 456 U. S. 63, 68 (1982) (quoting *Richards* v. *United States,* 369 U. S. 1, 9 (1962)). While it is possible, as Ardestani contends, that Congress' only intent in defining adversary adjudications was to limit EAJA fees to trial-type proceedings in which the Government is represented, Congress chose to refer to adversary adjudications "under section 554." Section 554 does not merely describe a type of agency proceeding; it also prescribes that certain procedures be followed in the adjudications that fall within its scope. We must assume that the EAJA's unqualified reference to a specific statutory provision mandating specific procedural protections is more than a general indication of the types of proceedings that the EAJA was intended to cover.

We are unable to identify *any* conclusive statement in the legislative history regarding Congress' decision to define adversary adjudications under the EAJA by reference to § 554, much less one that would undermine the ordinary understanding of the phrase "under section 554." It is not enough that the House Conference Committee Report on the EAJA states, without further comment, that adversary adjudications are "defined under" the APA. H. R. Conf. Rep. No. 96–1434, p. 23 (1980). Although it is conceivable that "defined under" means that Congress intended adversary adjudications covered by the EAJA to be those "as defined by" the APA, it could just as easily mean that covered adjudications are "defined as those conducted under" the APA. We are similarly unpersuaded that Congress meant to institute a substantive, rather than a semantic, change when, without

explanation, it changed the draft section of the EAJA defining "adversary adjudication" from "an adjudication *subject to* section 554," S. Rep. No. 96–253, p. 24 (1979) (emphasis added), to "an adjudication *under* section 554."

Our conclusion that any ambiguities in the legislative history are insufficient to undercut the ordinary understanding of the statutory language is reinforced in this case by the limited nature of waivers of sovereign immunity. The EAJA renders the United States liable for attorney's fees for which it would not otherwise be liable, and thus amounts to a partial waiver of sovereign immunity. Any such waiver must be strictly construed in favor of the United States. *Library of Congress* v. *Shaw*, 478 U. S. 310, 318 (1986); *Ruckelshaus* v. *Sierra Club*, 463 U. S. 680, 685–686 (1983).

Because we conclude that administrative immigration proceedings do not fall "under section 554" and therefore are wholly outside the scope of the EAJA, this case is distinguishable from those cases in which we have recognized that, once Congress has waived sovereign immunity over certain subject matter, the Court should be careful not to "assume the authority to narrow the waiver that Congress intended." *United States* v. *Kubrick*, 444 U. S. 111, 118 (1979); see, *e. g., Irwin* v. *Department of Veterans Affairs*, 498 U. S. 89, 95 (1990) ("Once Congress has made such a waiver, we think that making the rule of equitable tolling applicable to suits against the Government, in the same way that it is applicable to private suits, amounts to little, if any, broadening of the congressional waiver"); *Sullivan* v. *Hudson*, 490 U. S. 877, 892 (1989) (holding that Social Security administrative proceedings held on remand from a district court order "are an integral part of the 'civil action' for judicial review," and thus that attorney's fees for representation on remand are available under the civil action provisions of the EAJA, 28 U. S. C. § 2412).

Finally, we consider Ardestani's argument that a functional interpretation of the EAJA is necessary in order to

further the legislative goals underlying the statute. The clearly stated objective of the EAJA is to eliminate financial disincentives for those who would defend against unjustified governmental action and thereby to deter the unreasonable exercise of Government authority. Congressional Findings and Purposes, 94 Stat. 2325, note following 5 U. S. C. § 504; H. R. Rep. No. 96–1418, pp. 10, 12 (1980); S. Rep. No. 96–253, *supra*, at 5; *Commissioner, INS* v. *Jean*, 496 U. S. 154, 163 (1990).

We have no doubt that the broad purposes of the EAJA would be served by making the statute applicable to deportation proceedings. We are mindful that the complexity of immigration procedures, and the enormity of the interests at stake, make legal representation in deportation proceedings especially important. We acknowledge that Ardestani has been forced to shoulder the financial and emotional burdens of a deportation hearing in which the position of the INS was determined not to be substantially justified. But we cannot extend the EAJA to administrative deportation proceedings when the plain language of the statute, coupled with the strict construction of waivers of sovereign immunity, constrain us to do otherwise.

Congress has twice expanded the EAJA's definition of "adversary adjudications" to include proceedings previously considered to be outside the EAJA's coverage. In 1985, Congress legislatively overruled *Fidelity Construction Co.* v. *United States*, 700 F. 2d 1379 (CA Fed.), cert. denied, 464 U. S. 826 (1983), by amending § 504(b)(1)(C) to add certain proceedings under the Contract Disputes Act of 1978. See Pub. L. 99–80, § 1(c)(2)(B), 99 Stat. 184. In 1986, Congress amended the same section to add proceedings under the Program Fraud Civil Remedies Act of 1986. See Pub. L. 99–509, § 6103(c), 100 Stat. 1948. In this case as well, it is the province of Congress, not this Court, to decide whether to bring administrative deportation proceedings within the scope of the statute.

## III

We hold that administrative deportation proceedings are not adversary adjudications "under section 554" and thus do not fall within the category of proceedings for which the EAJA has waived sovereign immunity and authorized the award of attorney's fees and costs. We thus need not reach the Court of Appeals' alternative holding that the EAJA's fee-shifting provisions are precluded by § 292 of the INA, 8 U. S. C. § 1362, which provides that an individual in an administrative deportation proceeding may be represented by counsel "at no expense to the Government." The judgment of the Court of Appeals is affirmed.

*It is so ordered.*

JUSTICE THOMAS took no part in the consideration or decision of this case.

JUSTICE BLACKMUN, with whom JUSTICE STEVENS joins, dissenting.

The Immigration and Naturalization Service (INS or Service) put petitioner Ardestani through the ordeal of a deportation proceeding and attempted to return her to a land in which, the State Department had already determined, she had a well-founded fear of persecution for her religious convictions. The Service has since abandoned its argument that its position in this matter was "substantially justified." Instead, it now argues only that deportation proceedings are not among the class of proceedings for which the Equal Access to Justice Act (EAJA), 5 U. S. C. § 504 and 28 U. S. C. § 2412, authorizes awards of attorney's fees. The Court today accepts this contention, relying on the purportedly "plain" meaning of the statute and the canon that waivers of sovereign immunity are to be construed strictly.

I do not find the meaning of the relevant EAJA provisions "plain," nor do I agree that the Court's canon is applicable

to the EAJA. In my view, deportation proceedings exemplify the kind of adjudications for which Congress authorized fee awards: The alien's stake in the proceeding is enormous (sometimes life or death in the asylum context); the legal rules surrounding deportation and asylum proceedings are very complex; specialized counsel are necessary but in short supply; and evidence suggests that some conduct on the part of the Government in deportation and asylum proceedings has been abusive. The Court's opinion is all the more troubling for me, because it suggests that the Court has forgotten its recent admonition that the EAJA must be construed "in light of its purpose to diminish the deterrent effect of seeking review of, or defending against, governmental action." *Sullivan* v. *Hudson*, 490 U. S. 877, 890 (1989) (internal quotation marks omitted). Indeed, notably absent in the Court's opinion is any account of the statutory purpose that could be advanced by excluding deportation proceedings from EAJA coverage.

Proper application of established principles entitles Ardestani to a fee award. Accordingly, I dissent.

I

The Court correctly observes that petitioner Ardestani's eligibility for EAJA fees depends upon whether a deportation proceeding qualifies as an "adversary adjudication." The Act defines that key term in § 504(b)(1)(C)(i): " '[A]dversary adjudication' means . . . an adjudication under [5 U. S. C.] section 554 . . . in which the position of the United States is represented by counsel or otherwise." Because all agree that the position of the United States in fact was represented by counsel, the only issue is whether a deportation proceeding can be construed as "an adjudication under section 554," which is a part of the Administrative Procedure Act (APA).

Respondent INS argues that the phrase "adjudication under section 554" is unambiguous and can refer only to an

adjudication "governed by" or "conducted under the authority of" § 554. The Service emphasizes this Court's holding in *Marcello* v. *Bonds*, 349 U. S. 302 (1955), that deportation proceedings are governed by the provisions of the Immigration and Nationality Act of 1952, rather than by § 554 or other provisions of the APA. Accordingly, the INS contends, a deportation proceeding is not an adjudication "under section 554" and therefore is not an "adversary adjudication" within the meaning of the EAJA.

The Court accepts this conclusion because it accepts the Service's crucial assumption that the statutory words "under section 554" have a single, "plain" meaning—the one that the INS urges. The statutory words might be given the interpretation the INS recommends, at least if those words are considered in isolation. That is not to say, however, that the statutory language is "plain" or "unambiguous."

In my view, the statutory context of the words "adjudication under section 554" suggests a very plausible alternative interpretation. These words appear as part of a definition for the compound term "adversary adjudication," namely, "an adjudication under section 554 . . . in which the position of the United States is represented by counsel or otherwise." This provision establishes a definition for both components of the term "adversary adjudication": The reference to representation of the Government's position "by counsel or otherwise" defines what makes an administrative proceeding *adversary;* the reference to § 554 defines what makes a procedure an *adjudication.*

The EAJA could have been drafted to specify explicitly the features that constitute an "adjudication" for fees purposes. The term "adjudication," however, already had an accepted meaning at the time the EAJA was enacted. Rather than reproduce that definition, Congress simply referred the reader, shorthand, to the features described in § 554, the APA section that defines a generic adjudication. The words "adjudication under section 554" plausibly mean

"adjudication, *as defined in* section 554," or "adjudication, *within the meaning of* section 554," or, more literally, "adjudication, *as defined under the heading of* section 554."

Because the meaning of "adjudication under section 554" is ambiguous, we consult the EAJA's legislative history and decide between the two interpretations "in light of [the EAJA's] purpose to diminish the deterrent effect of seeking review of, or defending against, governmental action." *Sullivan* v. *Hudson*, 490 U. S., at 890 (internal quotation marks omitted).

## II

The EAJA's purposes are clearly stated. The Report of the House Committee on the Judiciary notes that the high cost of legal assistance and the superior resources and expertise of the Federal Government precluded private parties from challenging or defending against unreasonable governmental action. H. R. Rep. No. 96–1418, pp. 9–10 (1980) (House Report). Fee awards were intended to address this problem: "When there is an opportunity to recover costs," the Committee noted, "a party does not have to choose between acquiescing to an unreasonable Government order or prevailing to his financial detriment." *Id.*, at 12. Nor, the Committee observed, would the availability of attorney's fees vindicate only private interests. Because "a party who chooses to litigate an issue against the Government is not only representing his or her own vested interest but is also refining and formulating public policy," the Committee recognized, adjudication may ensure the "legitimacy and fairness of the law." *Id.*, at 10. Thus, removing disincentives to adjudication when the Government acts unreasonably both vindicates individual rights and curbs governmental excesses. *Id.*, at 12.

Congress' description of the scope of "adversary adjudication" focuses on the "adversariness" requirement—the presence or absence of Government representation—rather than on whether or not § 554 technically governs an adjudication.

Two of the three definitions offered in the EAJA Conference Report state only that an adversary adjudication is an adjudication where the agency has taken a position or is represented by counsel; they omit altogether any mention of § 554. See H. R. Conf. Rep. No. 96–1434, pp. 21, 23 (1980) (Conference Report). According to the third definition:

> "The conference substitute defines adversary adjudication as an agency adjudication *defined under* the Administrative Procedures *[sic]* Act where the agency takes a position through representation by counsel or otherwise. It is intended that this definition precludes an award in a situation where an agency, e. g., the Social Security Administration, does not take a position in the adjudication. If, however, the agency does take a position at some point in the adjudication, the adjudication would then become adversarial" (emphasis added). *Id.*, at 23.

This definition repeats the Report's earlier focus on the presence or absence of counsel as the decisive factor in determining whether an adjudication is adversary. More important, in its use of the words "defined under," the Report suggests that an adjudication need not be governed by the APA, but only—as deportation proceedings surely do—correspond to the definition of an adjudication given in the APA.

Nowhere in the Committee Reports or in the floor debates is there any suggestion that the words "under section 554" were intended to exclude any particular agency's adjudications (let alone the INS') from EAJA coverage. Nor was it ever discussed whether a particular agency's adjudications were or were not technically governed by § 554 or other provisions of the APA. Indeed, Congress seems to have given no attention whatsoever to whether particular administrative proceedings were *adjudications*, as opposed to, for example, rulemaking, ratemaking, or licensing proceedings. Instead, Congress' focus was on whether certain proceed-

ings, universally assumed to be adjudications, were *adversary*—that is, whether the Government was represented by counsel or had otherwise staked out a position. In short, the reference to § 554 seems to be nothing but a statutory "hook"—a convenient way to signal, in the statutory text, the essential and uncontroversial characteristics of an "adjudication."

This interpretation is confirmed by the one special case of agency proceedings that Congress examined with any particularity: Social Security Administration proceedings. This Court had refrained from deciding whether such proceedings are governed by § 554. See *Richardson* v. *Perales*, 402 U. S. 389, 409 (1971). The EAJA Conference Report makes clear that, notwithstanding this uncertainty, Congress considered a Social Security Act administrative proceeding to be covered by the EAJA if the adjudication was "adversary," that is, if the United States had staked out a position. See Conference Report, at 23, quoted *supra*, at 143. The House Judiciary Committee Report on the EAJA's 1985 reenactment is to similar but stronger effect:

> "As enacted in 1980, the Act covers 'adversary adjudication'—i. e., an adjudication under section 554 of [5 U. S. C.] 'in which the position of the United States is *represented by counsel* or otherwise'. . . . While this language generally excludes Social Security administrative hearings from the Act, Congress made clear in 1980 that 'If . . . the agency does take a position at some point in the adjudication, the adjudication would then become adversarial,' and thus be subject to the Act. It is the committee's understanding that the Secretary of Health and Human Services has implemented an experiment in five locations in which the Secretary is represented at the hearing before the administrative law judge. *This is precisely the type of situation covered by section 504(b)(1)(C).* While, generally, Social Security adminis-

trative hearings remain outside the scope of this statute, *those in which the Secretary is represented are covered by the Act*" (footnote omitted; first emphasis in original; others supplied). H. R. Rep. No. 99–120, pp. 10–11 (1985).

Thus, despite this Court's demurral regarding whether Social Security proceedings are technically governed by § 554, and without expressing any view whatsoever on this issue, Congress nevertheless stated that EAJA fees were appropriate. This circumstance strongly indicates that Congress did not intend EAJA coverage to depend upon whether § 554, rather than some functionally equivalent provision, technically governs the proceeding.

## III

As noted above, this Court recently held in *Sullivan* v. *Hudson* that the EAJA is to be "read in light of its purpose 'to diminish the deterrent effect of seeking review of, or defending against, governmental action.'" 490 U. S., at 890. In particular, the Court held that while Social Security Administration proceedings on remand from federal district courts were not adversary adjudications, because the Government's position was not represented by counsel or otherwise, *id.*, at 891, they were nevertheless "part and parcel" of the civil action, and thus were covered by the "civil action" provisions of the EAJA. *Id.*, at 888.

In so holding, the Court rejected a plain meaning argument stronger than the one advanced here. The Government had argued that the term "civil action" unambiguously excluded administrative proceedings, and that the specific exclusion of Social Security provisions from administrative EAJA coverage precluded, by the principle of *expressio unius est exclusio alterius*, their coverage under civil action

EAJA.[1]  *Id.*, at 891.  The Court conceded that this contention was "not without some force," but went on to say that it did not "ris[e] to the level necessary to oust what we think is the most reasonable interpretation of the statute in light of its manifest purpose."  *Id.*, at 890.

The Court recognizes that there is no question that application of the EAJA to deportation proceedings would advance the Act's manifest purposes of protecting individuals' rights, deterring unjustified governmental action, and "help[ing] assure that administrative decisions reflect informed deliberation."  House Report, at 12.  Indeed, unjustified INS deportation proceedings are a classic example of a situation in which persons "may be deterred from seeking review of, or defending against unreasonable governmental action because of the expense involved" and the "disparity between the resources and expertise of these individuals and their government."  House Report, at 5 and 6.  An alien facing deportation generally is unfamiliar with the arcane system of immigration law, is often unskilled in the English language, and sometimes is uneducated; for these reasons, "deportation hearings are difficult for aliens to fully comprehend, let alone conduct, and individuals subject to such proceedings frequently require the assistance of counsel." *Escobar Ruiz* v. *INS*, 838 F. 2d 1020, 1026 (CA9 1988) (en banc).  In many areas, competent counsel is difficult to obtain.  See Anker, Determining Asylum Claims in the United States, 2 Int'l J. of Refugee Law 252, 261 (1990).  Evidence indicates that the INS has engaged in abusive litigation tactics.  See Watson, No More "Independent Operators," Legal Times, May 14, 1990, p. 2 (quoting remark of William P. Cook, then INS General Counsel, that "I have been told that some

---

[1] The argument was stronger in *Hudson* because the legislative history of administrative EAJA explicitly precluded its application to the Social Security proceedings involved in that case, and because the Court's argument against application of *expressio unius* was weaker than the argument made here against application of the sovereign immunity canon.

of my offices appeal every adverse decision regardless of the merits, . . . [and] that others refuse to have stipulations"); Note, Applying the Equal Access to Justice Act to Asylum Hearings, 97 Yale L. J. 1459, 1471 (1988) (describing an INS pattern of "vigorous opposition to adjudicated asylum claims, often irrespective of the merits").

Finally, the stakes for the alien involved in deportation proceedings—particularly in asylum cases—are enormous. See, e. g., INS v. Cardoza-Fonseca, 480 U. S. 421, 449 (1987). Under these circumstances, application of the EAJA to deportation proceedings clearly would fulfill the statute's purposes.

The Court states two reasons, however, for recanting on its recent recognition in Hudson that EAJA is to be read "in light of its manifest purpose." The first is its argument that "the plain language of the statute" compels the Court to deny fees to Ardestani. This argument, as I already have suggested above, is not persuasive, and is in any event less persuasive than the similar argument rejected in Hudson.

The additional reason the Court gives for departing from Hudson is the canon of statutory interpretation that waivers of sovereign immunity must be strictly construed. For good reason, this argument has not been accepted in any other EAJA case decided by this Court. The purposes of the canon are to protect the public fisc and to provide breathing space for legitimate Government action that might be deterred by litigation. But these purposes are *already* fulfilled by the EAJA's requirement that even prevailing parties may not be awarded fees unless the Government's position lacked substantial justification. The Report of the Senate Committee on the Judiciary makes clear that this provision was adopted precisely in order to reduce the bill's cost and to prevent "a 'chilling effect' on proper Government enforcement efforts." S. Rep. No. 96–253, p. 2 (1979). Congress therefore, in effect, already has applied the maxim on which the Court relies. The Court's reapplication of that

maxim to restrict EAJA's scope still further is not merely superfluous, but is inconsistent with congressional intent.[2]

### IV

Because the Court accepts the INS' "plain meaning" and sovereign immunity arguments, it has no cause to address the Government's two remaining arguments. Both are easily resolved against the Government.

The INS suggests, first, that the Court owes deference to the Attorney General's determination that the EAJA does not apply to deportation proceedings. This Court has indicated, however, that reviewing courts do not owe deference to an agency's interpretation of statutes outside its particular expertise and special charge to administer. See *Adams Fruit Co.* v. *Barrett*, 494 U. S. 638, 649–650 (1990); see also *Professional Reactor Operator Soc.* v. *NRC*, 291 U. S. App. D. C. 219, 223, 939 F. 2d 1047, 1051 (1991) (no deference to agency interpretation of APA, because agency not assigned special role by Congress in construing that statute). Because the EAJA, like the APA, applies to all agencies and is not administered by any one in particular, deference to the interpretation by any particular agency is inappropriate.

The INS argues, second, that a fee award in this case is proscribed by § 292 of the Immigration and Nationality Act

---

[2] The 1985 House Report on EAJA's reenactment observed that the actual cost of awards in administrative adjudications was only a tiny fraction of what had originally been estimated. The 1980 House Report had projected $19.4 million in fiscal year (FY) 1982, $21.3 million in FY 1983, and $22.4 million in FY 1984, for a total of $63.1 million. See House Report, at 23. The actual outlays totaled only about $158,000—roughly one-quarter of one percent of the original estimate. See H. R. Rep. No. 99–120, pp. 8–9 (1985). The 1985 Report describes this situation as a "problem in implementing the Act" caused by overly narrow judicial and agency interpretations.

of 1952, which provides that a person involved in a deportation proceeding "shall have the privilege of being represented (at no expense to the Government) by such counsel ... as he shall choose." 66 Stat. 235, 8 U. S. C. § 1362. The INS argues that this provision is a specific bar on fee shifting in deportation proceedings that necessarily overrides the EAJA's general fee-shifting policy. The legislative history of the EAJA clearly states, however, that the statute "applies to all civil actions except . . . those already covered by existing fee-shifting statutes." House Report, at 18. There is no reason to think that Congress would have held a different view regarding the EAJA's administrative provisions. Because the Immigration and Nationality Act of 1952 contains no fee-shifting provisions, it cannot bar the EAJA's application.

Nor is the Government correct that this interpretation would effectively repeal § 292. The purpose of § 292 is to relieve the Government of any general obligation to appoint and pay counsel for indigent aliens. See *Escobar Ruiz* v. *INS*, 838 F. 2d, at 1028. The purpose of the EAJA, on the other hand, is to reimburse persons who prevail in those cases where the Government's action was not substantially justified. By virtue of their different purposes, the two statutes may coexist. No alien has an automatic right to Government-appointed and Government-paid counsel. And in all cases where the Government's action is substantially justified—the vast majority of cases, one would hope—the alien has no claim against the Government for attorney's fees.

V

In sum, EAJA's ambiguous definition of the term "adversary adjudication" can be read to support Ardestani's position; the legislative history confirms her interpretation; and the purposes of the EAJA, in whose light the Court heretofore has interpreted the statute, strongly favor the availability of attorney's fees in deportation proceedings. I can only

hope that the Court's departure from its approach in *Hudson* signals no permanent change in its EAJA jurisprudence. I would hold that Ardestani is entitled to a fee award and would reverse the judgment of the Court of Appeals.