**AMERICAN PUBLIC POWER ASSOCIATION, et al., Petitioners,**

v.

**U.S. NUCLEAR REGULATORY COMMISSION, Respondent,**

**Electric Utilities, et al., Springfield City Utilities, Entergy Operations, Inc., et al., Intervenors.**

No. 92–1061.

United States Court of Appeals, District of Columbia Circuit.

Argued March 9, 1993.

Decided April 13, 1993.

Ben Finkelstein, with whom Robert A. Jablon, Cynthia S. Bogorad, and Russell F. Smith, III, Washington, DC, were on the brief, for petitioners and intervenor Springfield City Utilities.

Grace H. Kim, Atty., U.S. Nuclear Regulatory Com'n, Washington, DC, with whom William C. Parler, Gen. Counsel, John F. Cordes, Jr., Solicitor, and E. Leo Slaggie, Deputy Sol., U.S. Nuclear Regulatory Com'n, Rockville, MD, and Charles A. James, Acting Asst. Atty. Gen., John J.

Powers, III, and Marion L. Jetton, Attys., Dept. of Justice, Washington, DC, were on the brief, for respondent. David Seidman, Atty., Dept. of Justice, Washington, DC, and Marjorie S. Nordlinger, Atty., U.S. Nuclear Regulatory Com'n, Rockville, MD, also entered appearances for respondent.

Kathryn M. Kalowsky, Harold F. Reis, Joseph B. Knotts, Jr., Jay E. Silberg, Mitchell S. Ross, and John E. Matthews, Washington, DC, were on the brief for intervenors Alabama Power Co., et al.

Before: SILBERMAN, WILLIAMS, and D.H. GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

Petitioners (power generators and municipalities that compete with nuclear power plants) seek review of the NRC regulations interpreting the antitrust review provisions of the Atomic Energy Act. The NRC provided for such review only when new licenses are issued—not, as petitioners assert it must, when licenses are renewed. We deny the petition.

## I.

As passed in 1954, the Atomic Energy Act (the 1954 Act), Pub.L. No. 83–703, 68 Stat. 919 (1954), created a two-track licensing process for nuclear power plants. Section 103 authorized the Atomic Energy Commission (AEC) (the NRC's predecessor) to grant commercial licenses to nuclear plants for a 40–year term, with renewals permissible thereafter. But before the AEC could issue any commercial licenses, section 102 required that the agency first make a finding that such facilities had a "practical value." [1] Although it considered the matter several times, the AEC never made such a finding, and so never granted a section 103 commercial license under the

---

**1.** The 1954 Act appears to have borrowed the "practical value" requirement from the McMahon Act of 1946, Pub.L. No. 79–585, 60 Stat. 755 (1946), which had created a government monopoly over the development and control of atomic energy, weapons, facilities, and materials. Under the McMahon Act, the AEC could not license the manufacture or use of an atomic energy device before finding that it had "practical value." McMahon Act, § 7.

1954 Act. *See* H.R.REP. No. 1470, 91st Cong., 2d Sess. *reprinted in* 1970 U.S.CODE CONG. & ADMIN. NEWS 4981, 4989 [hereinafter Joint Committee Report]; BRIAN BALOGH, CHAIN REACTION, EXPERT DEBATE AND PUBLIC PARTICIPATION IN AMERICAN COMMERCIAL NUCLEAR POWER, 1945–1975, at 205–20 (1991).

Alternatively, under section 104(b) the AEC could issue an operating license, in the absence of a finding of practical value, for "research and development activities leading to the demonstration of the practical value of such facilities for industrial or commercial purposes." 68 Stat. 937. Until Congress amended the 1954 Act in 1970, every nuclear power plant in the United States received its license under section 104(b). Joint Committee Report, 1970 U.S.CODE CONG. & ADMIN. NEWS at 4989.[2] Although section 104 does not contain a renewal provision, nor a limit on the lifespan of its licenses (unlike section 103), the NRC promulgated regulations in 1956 imposing a 40–year term on all licenses with renewal possible upon expiration. *See* 10 C.F.R. § 50.51.

Under section 105(c) of the Act, Congress provided for antitrust review before the grant of a commercial license. "Whenever the Commission proposes to issue any license to any person under section 103, it shall notify the Attorney General of the proposed license and the proposed terms and conditions thereof...." Atomic Energy Act of 1954, § 105(c), 68 Stat. 938. Ninety days thereafter, the Attorney General must advise the Commission whether "the proposed license would tend to create or maintain a situation inconsistent with the antitrust laws." *Id.* Section 105(c) then required that the result of the antitrust review be published in the Federal Register. Section 105 did not, however, subject section 104(b) research and development licenses to antitrust review. Under section 105, all operators were held accountable to the antitrust laws only as enforced by the courts and other government agencies. The AEC also was ordered to report any information of antitrust violations involving atomic energy to the Attorney General. § 105(b), 68 Stat. 938.

Congress changed this state of affairs in its 1970 Amendments to the Atomic Energy Act (The 1970 Amendments). Pub.L. No. 91–560, 84 Stat. 1472 (codified at 42 U.S.C. § 2132 *et seq.* (1988)). Congress deleted the "practical value" finding requirement and instructed the AEC to grant all future licenses under section 103. *See* 42 U.S.C. § 2132(a). However, a grandfather provision was included that permitted reactors already operating under section 104(b) licenses to receive new licenses under the same section. *See id.* § 2132(b).

Congress also took the opportunity to clarify the Act's antitrust review provisions. A modified section 105 provided for mandatory antitrust review of applications for a construction permit. Review procedures "shall apply to an application for a license to construct or operate a utilization or production facility under section [103]." *Id.* § 2135(c)(2). The Commission then could implement a second review when it received a subsequent application for an operating license, but only if it found that "significant changes in the licensee's activities or proposed activities have occurred" after the review at the construction permit stage. *Id.*

Section 105(c)'s provisions are triggered only by "an application for a license." The Joint Committee on Atomic Energy expressed its understanding of the phrase thus:

> The committee recognizes that applications may be amended from time to time, that there may be applications to extend or *review* [sic ?] a license, and also that the form of an application for a construction permit may be such that, from the applicant's standpoint, it ultimately ripens into the application for an operating license. The phrases "any license application", "an application for a license",

2. The licensing procedures under both § 103 or § 104(b) are essentially the same. First, an applicant must receive a construction permit and build the facility. Then the applicant must receive a license to operate the plant. *See Power Reactor Dev. Co. v. International Union of Elec. Workers,* 367 U.S. 396, 405, 81 S.Ct. 1529, 1533, 6 L.Ed.2d 924 (1961).

and "any application" as used in the clarified and revised subsection 105 c. refer to the initial application for a construction permit, the initial application for [an] operating license, or the initial application for a modification which would constitute a new or substantially different facility, as the case may be, as determined by the Commission. The phrases do not include, for purposes of triggering subsection 105 c., other applications which may be filed during the licensing process.

Joint Committee Report, 1970 U.S.CODE CONG. & ADMIN. NEWS at 5010 (emphasis added).

As the licenses issued under the 1954 Act approached the end of their 40–year terms, the NRC developed rules to govern renewal. The Commission determined that rather than amending the term of the original license, nuclear plants would have to receive "renewed operating licenses" to continue operation after their initial licenses had expired. 56 Fed.Reg. 64,943, 64,961 (1991). Still, relying on the Joint Committee Report language quoted above, the Commission concluded that applications for section 103 license renewals did not normally trigger section 105(c)'s antitrust review provisions. "[U]nless the operating license renewal application constitutes an 'initial application,' or an initial application for a 'new or substantially different facility,' the [Act] does not require an antitrust review in connection with the renewal application." Id. at 64,969.

The Commission believed it unnecessary to even consider whether renewal of section 104(b) licenses required antitrust review. Because the amended section 102(b), 42 U.S.C. § 2132(b), explicitly grandfathered section 104(b)-licensed plants, the Commission did not need to issue new section 103 licenses to renew section 104(b) licenses. Id. at 64,970. Therefore, facili-

ties with section 104(b) licenses also would not be subject to antitrust review when they came up for renewal. The NRC's rule, then, eliminated antitrust review for all renewal applications, whether under section 103 or 104(b).

## II.

■ Petitioners' core argument focuses on the section 103 license renewal regulations. They contend that the language of section 105 of the Act unequivocally requires antitrust review of all section 103 applications. An application for renewal is no less "an application" under section 105(c)(2) than an application for a new license—therefore, end of case. There is no need for the Commission to examine legislative history because there is no statutory ambiguity.[3] We do not think, however, that the statutory language is all that clear. As even petitioners concede, Congress could not have intended that a minor amendment to an outstanding application be considered a separate application, and thus trigger a new antitrust review. Moreover, elsewhere in the statute, in section 103(c), the term license renewal is explicitly used and yet it is absent in section 105, which raises at least a question whether Congress intended section 105 to apply to renewals.

The Commission may well be correct in asserting that Congress—in the words of Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)—sought to address directly the issue presented to us. Congress chose to use the legislative history, not the general statutory language. In the Joint Committee Report quoted above, it seems more likely than not that Congress was referring to "renewal" when it used the term "review," and that

---

**3.** Even if the statute were unambiguous, it is by no means accepted that we should not examine the legislative history. See Chisom v. Roemer, —— U.S. ——, ——, 111 S.Ct. 2354, 2369, 115 L.Ed.2d 348 (1991) (Scalia, J., dissenting). Of course, it is practically impossible not to read what the parties put in their brief. As a general principle, however, virtually all judges would agree that there is a "strong presumption" that the actual language of the statute is by far the best indication of the statute's meaning. See Ardestani v. INS, —— U.S. ——, ——, 112 S.Ct. 515, 520, 116 L.Ed.2d 496 (1991).

review is a typographical error.[4] In that case, the report language emphasizing that the words "any application" means an "*initial* application" for a construction permit, operating license, or substantial modification would seem to have purposefully excluded an application for renewal. Because we cannot be certain that "review" was a typographical error, we do not think the legislative history compels us to adopt the Commission's interpretation. Rather, under the second step of *Chevron*, the question is whether the Commission's interpretation is a permissible one. Of course, at *Chevron* Step II we do not ignore the NRC's *Chevron* Step I argument, *see Natural Resources Defense Council, Inc. v. Reilly*, 976 F.2d 36, 43 (D.C.Cir.1992) (Silberman, J., concurring), and we agree with the Commission that "review" is *probably* a typographical error. That in itself, however, is not dispositive.

Petitioners' argument is not insubstantial. They claim that the very purpose of the original 40–year license term was to protect against antitrust abuses. The Commission itself, in its rulemaking, recognized that "[t]he 40–year license term in Section 103.c, which necessitates license renewal, was adopted for antitrust and financial reasons rather than safety or common defense and security reasons." 56 Fed. Reg. at 64,960. Eliminating antitrust review at the time of renewal, it is argued, would eviscerate the term limitation.

The Commission's direct response to this argument is not wholly persuasive. It maintains that the 40–year term was a compromise between the Justice Department's proposal of 20 years—based on antitrust concerns—and industry desires for longer or even unlimited terms. Congress chose the 40–year term, according to the NRC, because of actuarial considerations. That hardly negates the Commission's own determination that the 40–year term was fashioned, at least in part, with antitrust considerations in mind. The Commission also argues—more persuasively—that whatever Congress' purpose in 1954, the 1970 amendments are more to the point.

At that later stage, Congress focused more directly, if not without some ambiguity, on the subject of antitrust review. Given the imprecision in the statutory language and the Commission's plausible reliance on the Joint Committee Report, we think the Commission's construction of the 1970 amendments is a permissible one.

■ Petitioners urge that, even if antitrust review is not required for section 103 license renewals, the statute still commands it for "renewals" of section 104(b) licenses. According to petitioners, the NRC must relicense section 104 facilities by issuing *new* section 103 licenses. It is undisputed that new section 103 licenses may be issued only after antitrust review. The difficulty with petitioners' argument is that the 1970 Amendments specifically addressed this issue. Section 102(b) provides that "any license hereafter issued for a utilization or production facility ... the construction or operation of which was licensed pursuant to section 104b. prior to enactment into law of [the 1970 Amendments], shall be issued under section 104b." 42 U.S.C. § 2132(b). Antitrust review does not attach to applications for licenses under section 104 except upon request by one of a category of protestors who actually had intervened during an original construction permit proceeding to raise antitrust concerns. *See* § 105(c)(3), 42 U.S.C. § 2135(c)(3). It appears, then, that Congress meant to "grandfather" section 104 licenses and to exempt the licensees from seeking a new section 103 license.

■ Petitioners give facilities in the grandfather clause a rather narrow and artificial meaning. They define facilities as only those which have remained totally unchanged over 40 years. The Joint Committee did say in its 1970 report that if a "[section 104b] facility is to be modified to such a degree as to constitute a new or substantially different facility, as provided in a regulation or order issued by the Commission, the exception to section 103 licensing is not intended to be applicable to the necessary license amendment." Joint Com-

---

4. *See* 56 Fed.Reg. 64,969 n. 3 (NRC explanation of typographical error).

**1314**

mittee Report, 1970 U.S.CODE CONG. & ADMIN. NEWS at 5007. But that language seems to require the NRC to conduct an antitrust review only if the licensee seeks an amendment (or perhaps, if the NRC determines that the licensee should have sought an amendment), because a particular facility was to be or had been drastically. modified. Petitioners cannot support their claim that *all* facilities have been sufficiently modified to meet this test. Their position, moreover, would read section 102(b), the grandfather clause, out of the statute. Thus, we do not understand section 102(b) and its legislative history to require review of all section 104 renewals.

The balance of petitioners' arguments are basically policy oriented. Petitioners assert that the NRC's construction will have undesirable effects and undermine congressional purpose as broadly phrased. We suppose the NRC could have accepted petitioners' arguments and determined to conduct antitrust review as a matter of discretion, but we cannot say that the Commission's construction of the statute is unreasonable. We have no warrant to quarrel with the Commission's policy judgment that it discharges its responsibilities under the antitrust laws and the Act when it reports to the Attorney General any antitrust violations that come to its attention. *See* 42 U.S.C. § 2135(b). The Commission has permissibly chosen to limit its antitrust review duties to situations where it issues a new operating license.

For the foregoing reasons, the petition is denied.