**UNITED STATES of America,**
**Plaintiff,**

v.

**Leeanne SIART, Defendant.**

**No. F2297624.**

United States District Court,
D. Oregon.

Dec. 6, 2001.

William E. Fitzgerald, Assist. U.S. Atty., Eugene, OR, for U.S.

Lauren C. Regan, Bahr & Stotter Law offices, Eugene, OR, for Leeanne F. Siart.

## ORDER

COFFIN, United States Magistrate Judge.

On January 20, 2001, defendant Leeanne Siart was cited for failing to pay a $5.00 recreation use fee at the Oregon Dunes National Recreation Area (hereinafter "Dunes") in the Siuslaw National Forest. She had visited the Dunes that day with a companion, George Sexton.

Forest Service Law Enforcement Officer John Pino observed that a car registered to Siart was parked in a lot adjacent to a trailhead to the Dunes, and that a note on the dashboard entitled "Notice to Forest Officer" advised that the occupants of the vehicle were not engaging in a recreational activity and thus were not subject to the fee. When Siart and Sexton returned to the parking lot from the Dunes, Pino cited Siart after his attempts to ascertain which of them had actually driven the car into the lot resulted in the equivocal response that they both had driven the car that day.[1]

---

1. In implementing the recreational use fee program, it has been the general practice of the Forest Service to require that passes evidencing payment of the fee be displayed on the dashboard of a vehicle parked at a fee site, and to cite the driver of any vehicle without a pass. Citations are not issued to visitors who access a site by means other than an automobile, and only one pass is required

At trial, Sexton testified that he had driven the car onto the lot, not defendant Siart. He also testified that he and the defendant went to the Dunes for professional reasons—i.e., to check on snowy plover habitat and the impact of a potential federal predator control project on that habitat—as opposed to "recreational" purposes.[2]

### Standards of Review

 "It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000) (internal quotes omitted). A "strong presumption" exists that "the plain language of the statute expresses congressional intent." *Ardestani v. Immigration & Naturalization Serv.*, 502 U.S. 129, 135–36, 112 S.Ct. 515, 116 L.Ed.2d 496 (1991). This presumption is "rebutted only in rare and exceptional circumstances, when a contrary legislative intent is clearly expressed." *Id.* (internal quotes omitted). A maxim of statutory construction, *expressio unius est exclusio alterius*, provides that when a statute enumerates specific items, items not listed are excluded.

 When reviewing the actions of an executive agency acting without promulgating regulations,[3] "the level of deference afforded 'will depend on the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.'" *General Electric Co. v. Gilbert*, 429 U.S. 125, 140–46, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944)).

### Legal Issues

**1. Whether a "parking fee" is a valid "recreational user fee".**

 Defendant contends that P.L. 104–134 § 315 (the Recreational Fee Demonstration legislation) authorizes a "recreational use fee", not a "parking fee", and that the Forest Service has exceeded its authority in implementing what she characterizes as a "parking program".

I disagree. The logistics of collecting fees pursuant to this program rationally justify the government's focus on vehicles as a means to that end. Many fee sites are in remote areas and are primarily accessed by automobile. That the government abstains from collecting fees from hikers, bicyclists, or additional occupants[4] of a motor vehicle is not a bar to the collection of a user fee from the operator of a vehicle used to access a fee site.[5] In

---

per car, notwithstanding the number of occupants.

**2.** Sexton has a background in environmental law and works for the American Lands Alliance (ALA), a nonprofit organization that focuses on federal land management policies; Siart is an environmental biologist with the Oregon Natural Resources Council (ONRC). The ALA and ORNC work together on environmental projects.

**3.** Subsection (e) of the legislation at issue here provides that the appropriate Secretaries

"shall carry out this section without promulgating regulations."

**4.** At four fee sites, however, the Forest Service charges a fee per person as opposed to per vehicle. *See* Government Exhibit 107, p. 7.

**5.** Indeed, the authorization to charge fees explicitly allows the fees to be charged for admission to the area or for the use of area facilities, and to be charged to individuals or groups, in any combination the agency sees fit.

pertinent part, § 315 provides that fees shall be charged "for admission to the area or for the use of outdoor recreation sites". Nothing in the legislation precludes the collection of a fee by this method. It is within the discretion of the Forest Service to collect on a per-vehicle basis, especially where the overwhelming majority of users will have traversed to the fee site by car.

Defendant's additional argument that Pino cited the wrong person merits little discussion. The practice of the Forest Service in citing drivers for failing to pay the fee undoubtedly stems from the notion that the operator is in charge. But an owner is equally so—and even more so where, as here, she is personally present. Thus I find that Ms. Siart had the requisite control over her vehicle so as to be responsible for the payment of any valid admission fee occasioned by her automobile being used to access a fee site.

### 2. *Whether the act of researching snowy plover habitat merits a "recreational use fee".*

In a nutshell, defendant makes too much of the adjective "recreational" in the title of the legislation—i.e., Recreational Fee Demonstration Program. A recreational activity is something that one engages in to relax, be refreshed, be restored in body or mind. It is difficult to imagine that Congress intended the various federal agencies implementing the fee demonstration program to conduct inquisitions into and prove each site user's subjective state of mind: To determine whether this visitor was relaxing and enjoying himself while that visitor was stressed because his family dragged him away from the TV set for an outing he found to be more work than pleasure would be an impossible task for the administrators of this program.

I note, for example, that in defendant's printed "Notice to Forest Officer" which she posted on her dashboard, the notice in part specified that:

> The occupants of this vehicle are not engaged in any recreational activity.
>
> . . . . .
>
> The occupants are here for one or more of the following:
>
> Religious or spiritual reasons
>
> Educational purposes
>
> Work related purposes
>
> Health reasons
>
> Any other purpose other than a recreational activity.

Is the Forest Service to query a user's private religious and philosophical beliefs in enforcing the fee program? Are we to be treated to theologians opining at trial that a Wiccan on the Dunes is engaging in an act of worship while an agnostic is there for recreation?

Although the defendant cites a prior decision of this court (*United States v. Maris*, 987 F.Supp. 865 (D.Or.1997)) in support of her argument that the government may charge a fee only for a "recreational" use, that case is distinguishable. In *Maris*, the defendant only traveled through the Dunes fee area by automobile enroute to coastal public lands that were outside the boundary of the Oregon Dunes National Recreational Area. He parked his car outside the Dunes boundary and went surfing in the ocean. The defendant in *Maris* only drove on a road that traversed the Dunes; he did not stop, get out, or in any way "use" the Dunes facility other than to travel on a road through it. This court ruled that Congress did not intend, through the enactment of § 315, to overrule prior legislation banning the exaction of a toll over public right of ways. *Maris*, 987 F.Supp. at 868. There are numerous highways that cut through our national forests. It was manifestly not the intent of Congress

to authorize the Forest Service to set up toll booths to charge motorists for simply using roads that are public thoroughfares.

Had Maris parked his car at the Dunes lot and walked down the trailhead and over the Dunes with his surfboard, the argument that he was only passing through and was not there (on the Dunes) to "recreate" would not have carried the day. Clearly then he would have been *using* the site in a manner contemplated by the fee program.

The text of the legislation authorizes the various agencies to "charge and collect fees for *admission* to the area of for the *use* of outdoor recreation sites, facilities, visitor centers, equipment, and services by individuals and groups, or any combination thereof" (emphasis supplied). The Forest Service meets its burden of proof on this issue by demonstrating that Ms. Siart was admitted to a valid fee site area or used such an area. It is not an element of the case, and the government need not prove, that Ms. Siart was there solely for subjective "recreational" purposes. Although some non-recreational purposes may invoke rights which trump the fee program,[6] the defendant's asserted professional purpose for her trip to the Dunes does not itself mandate a dispensation from a valid fee. Although I agree that organizations such as ALA and ONRC often provide valuable service on environmental issues of public interest, such service invariably comes with administrative costs. Paying a fee to visit the Dunes is no more of a burden than paying at the pump to fuel the car that brought her there.

Furthermore, the Forest Service and other agencies participating in the fee demonstration program have the discretion to waive the payment of fees upon the receipt of a timely request for a waiver and an explanation of the reasons for such. A group of students taking a field trip as part of their biology studies may well receive a free pass upon the asking.[7] Ms. Siart herself might have obtained one had she but asked in advance and explained that she wished to survey plover habitat. But the discretionary power of the Forest Service to waive fees for students, scientists, and others does not render Pino's decision to cite Siart for failure to pay somehow arbitrary and capricious. Nor does the existence of such administrative exemptions otherwise provide Siart with a defense to the charge. It is hardly unusual—even in the private sector—for administrators of fee programs to grant discretionary exemptions. Many New York City firemen, for example, were admitted to the 2001 World Series free of charge. What would be remarkable, however, is a fee program that allowed an admittee to unilaterally decide whether she deserved an exemption. Defendant's asserted professional interest in entering the Dunes did not—absent an exemption from the Forest Service—relieve her of the obligation to remit any valid admission fee.

### 3. *Whether the fee was valid.*

■ At the time of the defendant's visit to the Dunes, the enabling legislation for the fee demonstration program authorized the Secretary of Agriculture to select from areas under his jurisdiction "no fewer than 10, but as many as 100, areas, sites or projects for fee demonstration."[8]

---

6. For example, a protest which implicates First Amendment protection.

7. Government Exhibit 107 (Northwest Forest Pass) provides that school groups are given

administrative day passes for official school field trips (p. 19).

8. This year, Congress amended § 315 again and deleted the cap on fee demonstration sites. *See* P.L. 107–63, § 312(b).

At trial, evidence was received concerning the "Northwest Forest Pass Business and Marketing Plan" (Plan) adopted by the Forest Service. The Plan covers 19 national forests, within which are 1349 fee sites, contrasted with 741 free sites.[9] Pursuant to the Plan, one may purchase an annual pass (at a cost of $30) or a day pass ($5) which suffice for access to all fee sites for the time period covered by the pass. A visitor who wishes to access only one fee site is still required to pay the minimum $5 fee.

Thus in the Northwest alone the Secretary of Agriculture appears to have exceeded the cap on fee demonstration areas or sites by over 1200 such discrete fee stations.

However, the government vigorously contends that the cap has not been exceeded, arguing that the Northwest Plan itself is but one "project", and thus the Secretary was still many projects short of the Congressional cap when Ms. Siart failed to pay the fee at the Dunes. Essentially, the government advocates that Congress intended the broadest possible construction of the term "project", i.e., any "plan", "scheme" or "proposal".

The problem with the government's interpretation is twofold:

First, such an expansive reading of "project" allows the Secretary to effectively nullify any cap whatsoever. There are 158 national forests in the United States. Using the government's definition, the Secretary could devise a single plan for all the national forests, designating a fee site at each and every trailhead, lake, campground, picnic area, etc. within each forest. Notwithstanding that visitors would be subject to a fee at perhaps tens of thousands of access points throughout our entire national forest system, the government's logic would still leave the Secretary 99 "plans" short of the cap. Such an interpretation of this legislation would require the court to find that Congress meant to enact a wholly illusory cap, or that it intended to confer unfettered discretion to the Secretary to bypass the cap by adopting an expansive fee demonstration plan.

The second problem with the government's position is that it ignores the context of the limiting language in § 315(b), other references to the term "projects" in the legislation, and the legislative history of the fee demonstration program.

Section 315(a) provides:

The Secretary of the Interior (acting through the Bureau of Land Management, the National Park Service and the United States Fish and Wildlife Service) and the Secretary of Agriculture (acting through the Forest Service) shall each implement a fee program to demonstrate the feasibility of user-generated cost recovery for the operation and maintenance of recreation areas or sites and habitat enhancement projects on Federal lands.

This leads into § 315(b), which I now set forth in full:

In carrying out the pilot program established pursuant to this section, the appropriate Secretary shall select from areas under the jurisdiction of each of the four agencies referred to in subsection (a) no fewer than 10, but as many as 100, areas, sites or projects for fee demonstration. For each such demonstration, the Secretary, notwithstanding any other provision of law -

(1) shall charge and collect fees for admission to the area or for the use of outdoor recreation sites, facilities, visi-

---

**9.** *See* Government Exhibit 107, Appendix N at p. 59.

tor centers, equipment, and services by individuals and groups, or any combination thereof;

(2) shall establish fees under this section based upon a variety of cost recovery and fair market valuation methods to provide a broad basis for feasibility testing;

(3) may contract, including provisions for reasonable commissions, with any public or private entity to provide visitor services, including reservations and information, and may accept services of volunteers to collect fees charged pursuant to paragraph (1);

(4) may encourage private investment and partnerships to enhance the delivery of quality customer services and resource enhancement, and provide appropriate recognition to such partners or investors; and

(5) may assess a fine of not more than $100 for any violation of the authority to collect fees for admission to the area or for the use of outdoor recreation sites, facilities, visitor centers, equipment, and services.

Section (c)(1), in pertinent part, specifies:

Amounts collected at each fee demonstration area, site, or project shall be distributed as follows . . .

Thus, Congress informs that it is authorizing the implementation of a pilot program to demonstrate the feasibility of user-generated cost recovery for the operation and maintenance of "recreation areas or sites and *habitat enhancement* projects" on federal lands (emphasis supplied). It then goes on to limit the "pilot program" to 100 such "areas, sites or projects". Congress next authorizes the charging and collection of fees for admission "*to the area or for the use of* outdoor recreation sites, facilities, visitor centers, equipment, and services by individuals and groups . . ."

Section 315(c)(1) makes it all the more clear that Congress intended "projects" to be a reference to site specific work and improvements, as Congress addresses the distribution of amounts collected "*at* each fee demonstration area, site *or project*".

One does not pay a fee to be admitted to, use, or visit a document such as the Forest Service's Northwest Forest Plan. It is plain that Congress intended fees to be charged for admission to or use of public lands.

Again, in another reference to "projects" in this legislation, Congress consistently employs the term narrowly and in a site-specific manner:

(3) In order to increase the quality of the visitor experience *at public recreational areas* and enhance the protection of resources, amounts available for expenditure under this section may only be used for the area, site *or project concerned,* for backlogged repair and maintenance projects (including projects related to health and safety) and for interpretation, signage, habitat or facility enhancement, resource preservation, annual operation (including fee collection), maintenance, and law enforcement relating to public use. The agencywide accounts may be used for the same purposes set forth in the preceding sentence, but for areas, sites or projects selected at the discretion of the respective agency head. (Emphasis supplied).

Given, then, that this is legislation that was enacted to test the waters with a pilot program of user fees at a discrete number of sites, that fees historically had not been charged to the public for accessing national forest land, and that Congress consistently used the term "projects" in other provisions of this legislation to reference site-specific habitat enhancement programs, maintenance, health and safety improvements and the like, the court cannot

accept the government's view that Congress intended the most expansive possible interpretation of the term.

### Conclusion

Because the Forest Service exceeded its authority under § 315 by charging and collecting fees at more than 100 sites, areas or projects on the date Ms. Siart accessed the Dunes, the citation issued to the defendant in this action is hereby dismissed.[10]

---

**10.** As noted previously, Congress has since repealed the limitation on fee collection sites. *See* P.L. 107–63, § 312(b). Thus this ruling is likely to have no impact on future enforcement actions.