09-4896-cv
John Wiley & Sons, Inc. v. Supap Kirtsaeng

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

August Term, 2010

(Argued: May 19, 2010                                    Decided: August 15, 2011)

Docket No. 09-4896-cv

JOHN WILEY & SONS, INC.,

        *Plaintiff-Appellee*,

        v.

SUPAP KIRTSAENG, doing business as BLUECHRISTINE99,

        *Defendant-Appellant*.

Before: CABRANES and KATZMANN, *Circuit Judges*, and MURTHA, *District Judge.*[*]

Appeal from a judgment of the United States District Court for the Southern District of New York (Donald C. Pogue, Judge of the United States Court of International Trade, sitting by designation), following a jury trial, awarding statutory damages to plaintiff publisher for copyright infringement. Defendant claims on appeal that the District Court denied him a defense under the "first sale doctrine," 17 U.S.C. § 109(a), and erred in evidentiary rulings which, he alleges, led to the award of unduly high damages. In a case of first impression in our Court, we hold (1) that the first sale doctrine, which allows a person who buys a legally produced copyrighted work to sell or otherwise dispose of the work as he sees fit, does not apply to works manufactured outside of the United States, and (2) that the District Court did not err in its evidentiary rulings.

Affirmed.

Judge Murtha dissents in a separate opinion.

---

[*] The Honorable J. Garvan Murtha, of the United States District Court for the District of Vermont, sitting by designation.

William Dunnegan  (Laura Scileppi, *on the brief*), Dunnegan LLC, New York, NY, *for plaintiff-appellee,*

SAM P. ISRAEL, New York, NY, *for defendant-appellant,*

John T. Mitchell, Interaction Law, Washington, DC, *for amici curiae Entertainment Merchants Association and National Association of Recording Merchandisers,*

Norman H. Levin (Aaron J. Moss, *on the brief*), Greenberg Glusker Fields Claman & Machtinger LLP, Los Angeles, CA, *for amicus curiae Costco Wholesale Corporation,*

Charles A. Weiss, Kenyon & Kenyon LLP, (Mark A. Abate, Goodwin Proctor LLP, *on the brief*), New York, NY, for *amicus curiae New York Intellectual Property Law Association. in support of plaintiff-appellee.*

JOSÉ A. CABRANES, *Circuit Judge*:

The "first sale doctrine" in copyright law permits the owner of a lawfully purchased copyrighted work to resell it without limitations imposed by the copyright holder.[1]  The existence of the doctrine dates to 1908, when the Supreme Court held that the owner of a copyright could not impose price controls on sales of a copyrighted work beyond the initial sale.[2]  Congress codified the doctrine in successive Copyright Acts, beginning with the Copyright Act of 1909.[3]

The principal question presented in this appeal is whether the first sale doctrine, 17 U.S.C. § 109(a), applies to copyrighted works produced outside of the United States but imported and resold in the United States.  Under another basic copyright statute, it is ordinarily the case that "[i]mportation into the United States, without the authority of the owner of copyright under [the Copyright Act], of

---

[1] The first sale doctrine is codified at 17 U.S.C. § 109(a) which reads, in relevant part:

> Notwithstanding the provisions of section 106(3) [of the Copyright Act], the owner of a particular copy . . . lawfully made under this title, or any person authorized by such owner, is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy . . . .

17 U.S.C. § 109(a).

[2] *See Bobbs-Merrill Co. v. Straus*, 210 U.S. 339, 350 (1908).

[3] *See* Copyright Act of 1909, ch. 320, § 41, 35 Stat. 1075, 1084 (1909); Copyright Act of 1947, ch. 391, § 27, 61 Stat. 652, 660 (1947); Copyright Act of 1976, ch. 1, § 109, 90 Stat. 2541, 2548 (codified at 17 U.S.C. § 109(a)) (1976).

copies . . . of a work that have been acquired outside the United States is an infringement of the [owner's] exclusive right to distribute copies . . . ."[4]

Defendant contends, however, that individuals may import and resell books manufactured abroad pursuant to 17 U.S.C. § 109(a), which provides that "the owner of a particular copy . . . lawfully made under [the Copyright Act], or any person authorized by such owner, is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy."

Defendant's claim is an issue of first impression in our Court.[5]

## BACKGROUND

**A. The Parties**

Plaintiff-appellee John Wiley & Sons, Inc. ("plaintiff" or "Wiley") is the publisher of academic, scientific, and educational journals and books, including textbooks, for sale in domestic and international markets. Wiley relies upon a wholly-owned subsidiary, John Wiley & Sons (Asia) Pte Ltd. ("Wiley Asia"), to manufacture books for sale in foreign countries.[6] While the written content of books for the domestic and international markets is often similar or identical, books intended for international markets can differ from the domestic version in design, supplemental content (such as accompanying CD-ROMS), and the type and quality of materials used for printing, including "thinner paper and different bindings, different cover and jacket designs, fewer internal ink colors, if any, [and] lower quality photographs and graphics." Joint App'x at 18. The foreign editions, moreover, are marked

---

[4] 17 U.S.C. § 602(a)(1).

[5] District courts within our Circuit have addressed this issue. *See Pearson Educ., Inc. v. Liu*, 656 F. Supp. 2d 407, 416 (S.D.N.Y. 2009) (Holwell, *J.*) (holding "dubitante" that § 109(a) does not apply to foreign manufactured goods imported into the United States); *Pearson Educ., Inc. v. Liao*, No. 07-Civ-2423 (SHS), 2008 WL 2073491, at *3-4 (S.D.N.Y. May 13, 2008) (Stein, *J.*) (holding that § 109(a) does not apply to foreign manufactured goods imported into the United States). In addition, the Ninth Circuit recently held that § 109(a) does not apply to foreign-manufactured goods unless they were previously imported and sold in the United States with the copyright holder's permission. *See Omega S.A. v. Costco Wholesale Corp.*, 541 F.3d 982 (9th Cir. 2008), *aff'd by an evenly divided Court*, *Costco Wholesale Corp. v. Omega, S.A.*, 131 S. Ct. 565 (2010).

[6] As a standard practice, Wiley obtains from its authors the assignment of U.S. and foreign copyrights of reproduction and distribution. The assignment of these copyrights allows Wiley to produce and distribute its works in both domestic and foreign markets.

3

with a legend to designate that they are to be sold only in a particular country or geographic region.

One example of such a designation reads as follows:

> **Authorized for sale in Europe, Asia, Africa and the Middle East Only.**
> This book is authorized for sale in Europe, Asia, Africa and the Middle East only
> [and] may not be exported.  Exportation from or importation of this book to
> another region without the Publisher's authorization is illegal and is a violation of
> the Publisher's rights.  The Publisher may take legal action to enforce its rights.
> The Publisher may recover damages and costs, including but not limited to lost
> profits and attorney's fees, in the event legal action is required.

Joint App'x at 406 (emphasis in original).

Defendant Supap Kirtsaeng ("defendant" or "Kirtsaeng") moved to the United States from Thailand in 1997 to pursue an undergraduate degree in mathematics at Cornell University.  According to Kirtsaeng, he later moved to California to pursue a doctoral degree.

**B. The Instant Action**

To help subsidize the cost of his education, Kirtsaeng allegedly participated in the following scheme: between 2007 and September 8, 2008, Kirtsaeng's friends and family shipped him foreign edition textbooks printed abroad by Wiley Asia.  In turn, Kirtsaeng sold these textbooks on commercial websites such as eBay.com.  Using the revenues generated from the sales, Kirtsaeng would reimburse his family and friends for the costs that they incurred during the process of acquiring and shipping the books and then keep any remaining profits for himself. Kirtsaeng claims that, before selling the textbooks, he sought advice from friends in Thailand and consulted "Google Answers," a website which allowed web users to seek research help from other web users, to ensure that he could legally resell the foreign editions in the United States.

On September 8, 2008, Wiley filed this action against Kirtsaeng in the United States District Court for the Southern District of New York (Donald C. Pogue, Judge of the United States Court of International Trade, sitting by designation), claiming, among other things, copyright infringement under

4

17 U.S.C. § 501,[7] trademark infringement under 15 U.S.C. § 1114(a), and unfair competition under New York state law.[8] Wiley sought a preliminary and permanent injunction under 17 U.S.C. § 502(a),[9] and statutory damages under 17 U.S.C. § 504(c).[10]

**C. Relevant Pre-Trial Proceedings**

In anticipation of trial, Kirtsaeng submitted proposed jury instructions charging that the first sale doctrine was a defense to copyright infringement. By Order dated October 9, 2009, the District

---

[7] 17 U.S.C. § 501(a) provides, in relevant part:

> Anyone who violates any of the exclusive rights of the copyright owner as provided by sections 106 through 122 [of the Copyright Act] or of the author as provided in section 106A(a), or who imports copies . . . into the United States in violation of section 602, is an infringer of the copyright or right of the author, as the case may be.

17 U.S.C. § 501(a).

Wiley holds registered United States copyrights for the American editions of the works at issue in this case. Although the foreign editions probably would not be protected by United States copyright law if infringement occurred abroad, *see Robert Stigwood Grp. Ltd. v. O'Reilly*, 530 F.2d 1096 (2d Cir. 1976), the sale of the foreign editions in the United States allegedly infringes the U.S. copyrights held by Wiley on its American editions.

[8] Wiley later abandoned its trademark and unfair competition claims.

[9] 17 U.S.C. § 502(a) provides, in relevant part:

> Any court having jurisdiction of a civil action arising under this title may, subject to the provisions of section 1498 of title 28, grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright.

17 U.S.C. § 502(a).

[10] 17 U.S.C. § 504(c)(1)-(2) provides, in relevant part:

> Except as provided by clause (2) of this subsection, the copyright owner may elect, at any time before final judgment is rendered, to recover, instead of actual damages and profits, an award of statutory damages for all infringements involved in the action, with respect to any one work, for which any one infringer is liable individually, or for which any two or more infringers are liable jointly and severally, in a sum of not less than $750 or more than $30,000 as the court considers just. . . . In a case where the copyright owner sustains the burden of proving, and the court finds, that infringement was committed willfully, the court in its discretion may increase the award of statutory damages to a sum of not more than $150,000.

17 U.S.C. § 504(c).

We have recently observed that "the total number of awards of statutory damages that a plaintiff may recover in any given action depends on the number of works that are infringed . . . regardless of the number of infringements of those works." *WB Music Corp. v. RTV Commc'n Grp., Inc..*, 445 F.3d 538, 540 (2d Cir. 2006) (internal quotation marks omitted).

Court prohibited Kirtsaeng from raising this defense and rejected the applicability of the first sale doctrine to foreign editions of textbooks, holding that "[t]here is no indication that the imported books at issue here were manufactured pursuant to the U.S. Copyright Act . . . [and,] [t]o the contrary, the textbooks introduced as evidence purport, on their face, to have been published outside of the United States."[11]

On October 23, 2009 and November 3, 2009, Kirtsaeng filed motions *in limine* to preclude the introduction at trial of (1) his online "PayPal" sales records, and specifically, evidence of his gross revenues from the sales of the foreign editions of Wiley's books, and (2) the profits he earned on unrelated sales activities. From the bench during a pre-trial conference on November 3, 2009, the District Court granted the motions in part and denied them in part. The Court explained that Wiley could not introduce evidence of profits earned by Kirtsaeng from the sales of textbooks produced by other publishers, but "in . . . anticipation that the net worth testimony [would indicate] that [Kirtsaeng did not have] significant net worth . . . [Wiley's counsel had the] right to inquire about additional revenues and the profits therefrom and where they went in order to make sure that we had an accurate record about [Kirtsaeng's] net worth." Joint App'x at 195. The Court further stated that Wiley's counsel "must be careful not to refer to these [unrelated] sales in any way as infringing sales, because that would be entirely improper." *Id.*

**D. Events at Trial**

At trial, during direct examination, Wiley's counsel asked Kirtsaeng, "Now sir, if we were to go back and look at January 1st of 2008, what were your financial assets at that point in time?"

The District Court sustained an objection by Kirtsaeng's counsel and a sidebar discussion

---

[11] *See John Wiley & Sons, Inc. v. Kirtsaeng,* No. 08 Civ. 7834, 2009 WL 3364037, at *9 (S.D.N.Y. Oct. 19, 2009) (DCP).

followed.

After the sidebar conference and a recess, the first question by Wiley's counsel to Kirtsaeng was: "Mr. Kirtsaeng, before the break we were talking about your net worth during the period of 1999, correct? Excuse me. 2009." Kirtsaeng answered "yes." Wiley's counsel proceeded to ask Kirtsaeng a series of questions about his "net worth" in an attempt to impeach his previous statements. Specifically, he attempted to enter into evidence a record of Kirtsaeng's PayPal revenues, showing $1.2 million in revenues, in contrast to Kirtsaeng's previous testimony that he had earned only $900,000 in revenues. Joint App'x at 295-97.

At a second sidebar conference, during which the jury was excused from the courtroom, the District Court excluded the record of the PayPal evidence as "confusing and unfairly prejudicial." *Id.* at 298.

When the jury reentered the courtroom, Wiley's counsel continued to ask Kirtsaeng about his revenues from eBay sales. Although Kirtsaeng's counsel immediately objected to the line of questioning on the basis that it had already been "asked and answered"—an objection the District Court initially sustained—the Court subsequently allowed the questioning, explaining that it was uncertain whether the same questions had in fact been asked of the witness earlier in the examination.

At the end of the trial, the District Court charged the jury to determine whether Kirtsaeng had infringed the copyrights of each of eight works and whether any such infringements had been willful. The District Court explained that, under the statutory damages scheme found at 17 U.S.C. § 504(c), *see* note 10, *ante*, if the jury found that Kirtsaeng had infringed Wiley's copyright, it could award no less than $750 and no more than $30,000 in damages for each infringed work.

The District Court identified two exceptions to this rule. First, the District Court instructed the jury that, if it found that Wiley had proved by a preponderance of the evidence that the infringement was willful, under the statutory scheme the jury had the option of awarding up to $150,000 in damages

7

per infringed work. Second, if the jury found that Kirtsaeng had proved by a preponderance of the evidence "that he was not aware and had no reason to believe that his acts constituted an infringement of copyright," the jury could choose to impose an award of statutory damages as low as $200 per infringed work. The jury ultimately found Kirtsaeng liable for willful copyright infringement of all eight works and imposed damages of $75,000 for each of the eight works.

Kirtsaeng filed a timely notice of appeal. He claims that (1) the District Court erred in holding that the first sale doctrine was not an available defense in the circumstances presented; (2) the District Court should have advised the jury of the first sale doctrine as a defense to the claim of willful infringement; and (3) with respect to the jury's assessment of statutory damages, the admission into evidence of testimony regarding the amount of Kirtsaeng's gross receipts was unduly prejudicial.

## DISCUSSION

**A. The first sale doctrine does not apply to goods produced outside of the United States.**

*1. Standard of review*

The threshold question is whether, pursuant to § 109(a) of the Copyright Act, *see* note 1, *ante*, the District Court correctly determined that the phrase "lawfully made under this title" does not include copyrighted goods manufactured abroad.

Where the decision of a district court "presents only a legal issue of statutory interpretation . . . [w]e review *de novo* whether the district court correctly interpreted the statute."[12]

*2. Interpreting the First-Sale Doctrine*

In the Copyright Act of 1976, Congress enacted what is now 17 U.S.C. § 602(a)(1).[13] That

---

[12] *Perry v. Dowling*, 95 F.3d 231, 235 (2d Cir. 1996) (citing *White v. Shalala*, 7 F.3d 296, 299 (2d Cir. 1993)).

[13] In 2008, Congress amended the statute, resulting in the re-designation of what had been § 602(a) as § 602(a)(1). Act of October 13, 2008, Pub. L. 110-403, Title I, § 105(b)-(c)(1), 122 Stat. 4259.

section provides:

> Importation into the United States, without the authority of the owner of copyright under this title, of copies or phonorecords of a work that have been acquired outside the United States is an infringement of the exclusive right to distribute copies or phonorecords under section 106, actionable under section 501.

Even if the conduct at issue in this case is otherwise covered by this statutory language, Kirtsaeng contends that he is shielded from any liability under the Copyright Act by § 109(a), *see* note 1, *ante*. Again, in relevant part, that section provides: "Notwithstanding the provisions of section 106(3) [of the Copyright Act], the owner of a particular copy . . . lawfully made under this title, or any person authorized by such owner, is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy." Section 109(a) is a codification of the longstanding "first sale doctrine."[14]

---

[14] The first sale doctrine was first endorsed by the Supreme Court in the landmark 1908 case of *Bobbs-Merrill Co. v. Straus*, 210 U.S. 339, 350-51 (1908). In that case, the publishers of *The Castaway*, a popular novel, inserted the following notice after the title page of the book: "The price of this book at retail is $1 net. No dealer is licensed to sell it at a less [sic] price, and a sale at a less [sic] price will be treated as an infringement of the copyright." *Id.* at 341. The publishers subsequently sued a department store that had purchased copies of the books at wholesale and sold them each at retail for eighty-nine cents. The Supreme Court held:

> The purchaser of a book, once sold by authority of the owner of the copyright, may sell it again, although he could not publish a new edition of it.
> . . . .
> In our view the copyright statutes, while protecting the owner of the copyright in his right to multiply and sell his production, do not create the right to impose, by notice, such as is disclosed in this case, a limitation at which the book shall be sold at retail by future purchasers, with whom there is no privity of contract.

*Id.* at 350.

The Supreme Court made clear that the matter before it "was purely a question of statutory construction." *Id.* The relevant statute provided that copyright owners had "the sole liberty of printing, reprinting, publishing, completing, copying, executing, finishing, and *vending*" their copyrighted works. Copyright Act of 1891, § 4952, 26 Stat. 1107 (emphasis added). Congress promptly codified the holding in *Bobbs-Merrill*—which became known as the first sale doctrine—in the 1909 Copyright Act. Copyright Act of 1909, ch. 320, § 41, 35 Stat. 1075, 1084 (1909) ("[N]othing in this Act shall be deemed to forbid, prevent, or restrict the transfer of any copy of a copyrighted work the possession of which has been lawfully obtained.").

The current version of the first sale doctrine—as codified in § 109(a)—differs in two noticeable respects from the version Congress first passed in 1909. First, under current copyright law, the exclusive right to "vend" granted to copyright holders has been replaced by the exclusive right to "distribute." *See* § 106(3). However, the Supreme Court has indicated that, at least for purposes of the first sale doctrine, nothing of consequence turns on this alteration. *See Quality King*, 523 U.S. 135, 152 (1998). The second change is that the first sale doctrine no longer applies to "any copy of a copyrighted work," but rather, only to any copy "lawfully made under this title."

There is at least some tension between § 602(a)(1), which seemingly seeks to give copyright holders broad control over the circumstances in which their copyrighted material may be imported (directly or indirectly) into the United States, and § 109(a), which limits the extent to which the copyright holder may limit distribution following an initial sale. The Supreme Court first had occasion to address the interplay between § 602(a)(1) and § 109(a) in *Quality King Distributors, Inc. v. L'anza Research International, Inc.*[15]

*Quality King* involved the sales practices of L'anza Research International, a California corporation engaged in the business of manufacturing and selling shampoos, conditioners, and other hair care products. L'anza sold its products domestically and internationally, but its prices to foreign distributors were 35% to 40% lower than the prices charged to its domestic distributors. L'anza brought suit against Quality King Distributors, Inc., which had purchased shipments of L'anza's products from one of L'anza's foreign distributors and then re-imported the products into the United States for re-sale. L'anza alleged that Quality King's actions violated its "exclusive rights under 17 U.S.C. §§ 106, 501 and 602 to reproduce and distribute the copyrighted material in the United States."[16] The Supreme Court heard the case in order to decide the question of "whether the 'first sale' doctrine endorsed in § 109(a) is applicable to imported copies."[17]

In a unanimous opinion, the Supreme Court held that § 109(a), operating in combination with § 106(3), does in fact limit the scope of § 602(a).[18] However, there was a key factual difference at work in *Quality King* that is of critical importance to our disposition of the instant appeal. In *Quality King*, the copyrighted items in question had all been manufactured in the United States. Indeed, this important

---

[15] 523 U.S. 135 (1998).

[16] *Id.* at 140 (quotation marks omitted).

[17] *Id.* at 138.

[18] *Id.* at 145.

fact provided the basis for Justice Ginsburg's brief concurring opinion, in which she explained: "This case involves a 'round trip' journey, travel of the copies in question from the United States to places abroad, then back again. I join the Court's opinion recognizing that we do not today resolve cases in which the allegedly infringing imports were manufactured abroad."[19]

Although the majority opinion did not directly address the question of whether § 109(a) can apply to items manufactured abroad, the opinion contains instructive *dicta* that guides our disposition of the issue. In particular, the Court took pains to explain ways in which § 109(a) and § 602(a) do, and do not, overlap. As the Court stated: "[A]lthough both the first sale doctrine embodied in § 109(a) and the exceptions in § 602(a) may be applicable in some situations, the former does not subsume the latter; those provisions retain significant independent meaning."[20] For instance, § 602(a) "encompasses copies that are not subject to the first sale doctrine—e.g., copies that are lawfully made under the law of another country[.]"[21] The Court even pondered the following hypothetical:

> If the author of [a] work gave the exclusive United States distribution rights—enforceable under the Act—to the publisher of the United States edition and the exclusive British distribution rights to the publisher of the British edition, . . . presumably only those made by the publisher of the U.S. edition would be 'lawfully made under this title' within the meaning of § 109(a). The first sale doctrine would not provide the publisher of the British edition who decided to sell in the American market with a defense to an action under § 602(a) (or, for that matter, to an action under § 106(3), if there was a distribution of the copies).[22]

In these passages, the Court suggests that copyrighted material manufactured abroad cannot be subject to the first sale doctrine contained in § 109(a).

The Supreme Court recently seemed poised to transform this dicta into holding when it granted

[19] *Id.* at 154 (Ginsburg, J., concurring).

[20] *Id.* at 148-49 (majority opinion).

[21] *Id.* at 148.

[22] *Id.*

a writ of *certiorari* to review the Ninth Circuit's decision in *Omega S.A. v. Costco Wholesale Corp.*[23] That case involved the importation into the United States of Omega-brand watches by unidentified third parties without the permission of Omega; the watches were ultimately purchased and resold by Costco Wholesale Corporation. The Ninth Circuit maintained its well-settled position that § 109(a) does not apply to items manufactured outside of the United States unless they were previously imported and sold in the United States with the copyright holder's permission.[24] After hearing oral argument, an equally divided Supreme Court (with Justice Kagan recused) was obliged to affirm the judgment rendered by the Ninth Circuit.[25]

Without further guidance from the Supreme Court, we now consider the extent to which the protections set forth in § 109(a) may apply to items manufactured abroad. In doing so, we rely on the text of § 109(a), the structure of the Copyright Act, and the Supreme Court's opinion in *Quality King*.

*3. Textual Analysis*

We start, of course, by turning to the statutory language enacted by Congress. "Statutory interpretation always begins with the plain language of the statute, assuming the statute is unambiguous."[26] In the instant case, we are principally called upon to give meaning to the phrase "lawfully made under this title" contained in § 109(a).[27]

---

[23] 541 F.3d 982 (9th Cir. 2008).

[24] *Id.* at 990.

[25] *Costco Wholesale Corp. v. Omega, S.A.*, 131 S. Ct. 565 (2010).

[26] *Universal Church v. Geltzer*, 463 F.3d 218, 223 (2d Cir. 2006).

[27] Again, § 109(a), in relevant part, provides:

> Notwithstanding the provisions of section 106(3) [of the Copyright Act], the owner of a particular copy . . . lawfully made under this title, or any person authorized by such owner, is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy . . . .

17 U.S.C. § 109(a).

In arriving at a satisfactory textual interpretation of the statutory language at issue, we focus primarily on the words "made" and "under," but this task is complicated by two factors: (1) the word "made" is not a term of art in the Copyright Act,[28] and (2) "[t]he word 'under' is [a] chameleon" and courts "must draw its meaning from its context."[29] Wiley contends that we must interpret "lawfully made under this title" to mean "lawfully made in the United States." This view of the law—which was also adopted by the United States in its *amicus* brief before the Supreme Court in *Costco*[30]—is certainly consistent with the text of § 109(a).[31] It is also the logical consequence, Wiley submits, of the general presumption against the extraterritorial application of statutes,[32] a presumption which we have specifically applied to the copyright laws.[33] Wiley argues that Title 17 only applies in the United States, and thus, copyrighted items can only be "made" under that title if they were physically made in this country.

But the extraterritorial application of Title 17 is more complicated than Wiley allows, since certain provisions in Title 17 explicitly take account of activity occurring abroad. Most notably, § 104(b)(2) provides that "[t]he works specified by sections 102 and 103, when published, *are subject to protection under this title* if the work is first published in the United States *or in a foreign nation* that,

---

[28] A simple and authoritative dictionary definition of "made" is "artificially produced by a manufacturing process." *Webster's Third New International Dictionary* 1356 (1976).

[29] *Kucana v. Holder*, 130 S. Ct. 827, 835 (2010).

[30] Brief for the United States as *Amici Curiae* in Support of Respondent, at 5, *Costco Wholesale Corp. v. Omega, S.A.*, 131 S. Ct. 565 (2010) (No. 08-1423).

[31] The Supreme Court has previously defined "under" to mean "subject to" and "governed by." *Ardestani v. INS*, 502 U.S. 129, 135 (1991) (defining the meaning of the word "under" in the Equal Access to Justice Act).

[32] *See Morrison v. Nat'l Austl. Bank Ltd.*, 130 S. Ct. 2869, 2877 (2010) ("It is a longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." (quotation marks omitted)).

[33] *See, e.g.*, *Update Art, Inc. v. Modiin Pub., Ltd.*, 843 F.2d 67, 73 (2d Cir. 1988) ("It is well established that copyright laws generally do not have extraterritorial application.").

on the date of first publication, is a treaty party[.]"[34] Indeed, because § 104(b)(2) provides that copyright protection can apply to works published in foreign nations, it is possible to interpret § 109(a)'s "lawfully made under this title" language to mean, in effect, "any work that is subject to protection under this title."

There are other reasons why a textual analysis alone is not sufficient to support Wiley's preferred reading of § 109(a). Most obviously, if Congress had intended the first sale doctrine—at least as codified by § 109(a)—to apply only to works made in the United States, it could have easily written the statute to say precisely that.[35] Moreover, "lawfully made under this title" appears in other provisions of Title 17 where it is at least arguable that Congress intended this language to apply to works manufactured outside of the United States. For instance, § 1006(a)(1) of the Audio Home Recording Act provides for applicable royalty payments to be made to "any interested copyright party whose musical work or sound recording has been embodied in a digital musical recording or an analog musical recording lawfully made under this title that has been distributed . . . ."[36] It is the view of the U.S. Copyright Office that distribution of royalty payments under this Act is not limited to those recordings manufactured in the United States.[37]

But while a textual reading of § 109(a) does not compel the result favored by Wiley, it does not foreclose it either. The relevant text is simply unclear. "[L]awfully made under this title" could

---

[34] 17 U.S.C. § 104(b)(2) (emphasis added). *Quality King* also explained how certain provisions of Title 17 might apply to activity occurring abroad. 523 U.S. at 145 n.14 ("[T]he owner of goods lawfully made under the Act is entitled to the protection of the first sale doctrine in an action in a United States court even if the first sale occurred abroad. Such protection does not require the extraterritorial application of the Act any more than § 602(a)'s 'acquired abroad' language does."

[35] At oral argument before the Supreme Court in *Costco*, the United States tried to argue that its interpretation of § 109(a) (which, again, is also Wiley's) is not perfectly interchangeable with "lawfully made in the United States," "because at least in theory, it would be possible for the creation of a copy to entail a violation of environmental laws, workplace safety laws, minimum wage laws, et cetera." Transcript of Oral Argument at 38, *Costco Wholesale Corp. v. Omega, S.A.*, 131 S. Ct. 565 (2010) (No. 08-1423). This argument, while clever, is unpersuasive.

[36] 17 U.S.C. § 1006(a)(1)(A).

[37] *See Digital Audio Recording Technology (DART) Factsheet on Filing Claims for Royalty Distribution*, U.S. Copyright Office, http://www.copyright.gov/carp/dartfact.html (last visited June 23, 2011).

plausibly be interpreted to mean any number of things, including: (1) "manufactured in the United States," (2) "any work made that is subject to protection under this title," or (3) "lawfully made under this title had this title been applicable."[38]

   *4. Section 602(a)(1) and* Quality King

   Confronted with an utterly ambiguous text, we think it best to adopt an interpretation of § 109(a) that best comports with both § 602(a)(1) and the Supreme Court's opinion in *Quality King*.[39]

   Section 602(a)(1) prohibits the importation into the United States of copyrighted works acquired abroad without the authorization of the copyright holder. This provision is obviously intended to allow copyright holders some flexibility to divide or treat differently the international and domestic markets for the particular copyrighted item. If the first sale doctrine codified in § 109(a) only applies to copyrighted copies manufactured domestically, copyright holders would still have a free hand—subject, of course, to other relevant exceptions enumerated in Title 17, such as those in §§ 107, 108, and 602(a)(3)—to control the circumstances in which copies manufactured abroad could be legally imported into the United States. On the other hand, the mandate of § 602(a)(1)—that "[i]mportation into the United States, without the authority of the owner of copyright under [the Copyright Act], of copies . . . of a work that have been acquired outside the United States is an infringement of the [owner's] exclusive right to distribute copies"—would have no force in the vast majority of cases if the first sale doctrine was interpreted to apply to every work manufactured abroad that was either made

---

[38] Kirtsaeng would prevail if we adopted either of the latter two definitions, but these definitions, like Wiley's, are at best merely consistent with a textual reading of § 109(a). To further complicate the matter, both of these possible formulations are explicitly employed elsewhere in Title 17. *See* 17 U.S.C. § 401 ("Whenever a *work protected under this title* is published in the United States or elsewhere by authority of the copyright owner, a notice of copyright as provided by this section may be placed on publicly distributed copies from which the work can be visually perceived . . . ." (emphasis added)); 17 U.S.C. § 602(b) ("In a case where the making of the copies and phonorecords would have constituted an infringement of copyright *if this title had been applicable*, their importation is prohibited." (emphasis added)). Once again, if Congress had intended § 109(a) to reflect either one of those formulations, it could have employed their language with precision.

[39] *See David v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.").

"subject to protection under Title 17," or "consistent with the requirements of Title 17 had Title 17 been applicable."[40] This reading of the Copyright Act militates in favor of finding that § 109(a) only applies to domestically manufactured works. While the Ninth Circuit in *Omega* held that §109(a) also applies to foreign-produced works sold in the United States with the permission of the copyright holder, that holding relied on Ninth Circuit precedents not adopted by other courts of appeals. Accordingly, while perhaps a close call, we think that, in light of its necessary interplay with § 602(a)(1), § 109(a) is best interpreted as applying only to works manufactured domestically.

In adopting this view, we are comforted by the fact that our interpretation of § 109(a) is one that the Justices appear to have had in mind when deciding *Quality King*. There, the Court reasoned, admittedly in *dicta*, that § 602(a)(1) had a broader scope than § 109(a) because, at least in part, § 602(a)(1) "applies to a category of copies that are neither piratical nor 'lawfully made under this title.' That category encompasses copies that were 'lawfully made' not under the United States Copyright Act, but instead, under the law of some other country."[41] This last sentence indicates that, in the Court's view, works "lawfully made" under the laws of a foreign country—though perhaps not produced *in violation* of any United States laws—are not necessarily "lawfully made" insofar as that phrase is used in § 109(a) of our Copyright Act.[42]

Applying these principles to the facts of this case, we conclude that the District Court correctly decided that Kirtsaeng could not avail himself of the first sale doctrine codified by § 109(a) since all the

---

[40] Under Kirtsaeng's definition, § 602(a)(1) would only permit U.S. copyright holders to control the importation of their works into the United States when (i) the individual importing the work does not legally "own" the copy in question, or (ii) the work in question was produced in a country where United States copyright is not protected. While these remaining categories would ensure that § 602(a)(1) would not be rendered useless, copyright holders would have little control over the importation of their works under Kirtsaeng's theory. Specifically, in order to exclude certain copies from entering the United States, copyright holders would be required either to (i) not sell their goods, or (ii) produce them in countries that may not honor their copyright in the first place.

[41] 523 U.S. at 147.

[42] This interpretation seems to be confirmed by language later in the opinion explaining that § 602(a) has a broader scope than § 109(a) "because it encompasses copies that are not subject to the first sale doctrine—*e.g.*, copies that are lawfully made under the law of another country[.]" *Id.* at 148.

books in question were manufactured outside of the United States.[43] In sum, we hold that the phrase "lawfully made under this Title" in § 109(a) refers specifically and exclusively to works that are made in territories in which the Copyright Act is law, and not to foreign-manufactured works.[44]

We freely acknowledge that this is a particularly difficult question of statutory construction in light of the ambiguous language of § 109(a), but our holding is supported by the structure of Title 17 as well as the Supreme Court's opinion in *Quality King*. If we have misunderstood Congressional purpose in enacting the first sale doctrine, or if our decision leads to policy consequences that were not foreseen by Congress or which Congress now finds unpalatable, Congress is of course able to correct our judgment.

**B. The District Court did not err in its instructions to the jury.**

"We review jury instructions *de novo*, and reverse only when the charge, viewed as a whole, constitutes prejudicial error."[45] Kirtsaeng claims that the District Court erred by rejecting proposed jury instructions that acknowledged that the applicability of the first sale doctrine to foreign-produced

---

[43] We do note, however, that while all the books in question were printed abroad, they all bore American copyright notices. The same was true of the watches at issue in *Costco*. *See Omega S.A. v. Costco Wholesale Corp.*, 541 F.3d 982, 983 (9th Cir. 2008). One difference between the two cases is that at least two of the foreign editions at issue in the instant case contain explicit warnings invoking Title 17. For example, the back cover of *Fundamentals of Heat and Mass Transfer* (Sixth Edition) states: "No part of this publication may be reproduced, stored in a retrieval system, or transmitted in any form or by any means, electronic, mechanical, photocopying, recording, scanning, or otherwise, except as permitted under Section 107 or 108 of the 1976 United States Copyright Act . . . ." Joint App'x at 387. Since this book was "[p]rinted in Asia," and prohibited from ever being imported into the United States, we are admittedly somewhat puzzled as to why Title 17 is invoked. Nevertheless, to the extent Title 17 governs at all, we have no reason to conclude that every provision, including § 109(a), applies to the manufacture of works made abroad.

[44] Kirtsaeng argues that this holding is undesirable as a matter of public policy because it may permit a plaintiff to vitiate the first sale doctrine by "manufactur[ing] *all* of its volumes overseas only to then ship them into the U.S. for domestic sales." Defendant-Appellant's Br. at 21. Phrased differently, it is argued that any such decision may allow a copyright holder to completely control the resale of its product in the United States by producing its goods abroad and then immediately importing them for initial distribution. In this sense, the copyright holder would arguably enjoy the proverbial "best of both worlds" because, in theory, the consumer could not rely on the first sale doctrine to re-sell the imported work. In other words, the copyright holder would have an incentive to "outsource" publication to foreign locations to circumvent the availability of the first sale doctrine as a defense for consumers wishing to re-sell their works in the domestic market. The result might be that American manufacturing would contract along with the protections of the first sale doctrine. Kirtsaeng argues that this could not possibly have been Congress's intent. We acknowledge the force of this concern, but it does not affect or alter our interpretation of the Copyright Act.

[45] *United States v. Amato*, 540 F.3d 153, 164 (2d Cir. 2008).

goods was an unresolved question in the federal courts.  Specifically, Kirtsaeng argues that he was prejudiced by the Court's failure to charge that the first sale doctrine was an unsettled area of law because the charge was essential to his argument that he had performed pre-sale internet research regarding the legality of his sales and therefore had not "willfully" infringed the copyrights.

It is undisputed that Kirtsaeng's counsel did not object to the final jury instructions during trial. "[F]ailure to object to a jury instruction . . . prior to the jury retiring results in a waiver of that objection."[46]  Nonetheless, under Federal Rule of Civil Procedure 51(d)(2), we "may consider a plain error in the instruction that has not been preserved as required [under Rule 51] if the error affects substantial rights."

"To constitute plain error, a court's action must contravene an established rule of law."[47] Kirtsaeng does not meet his burden under this stringent standard.  Although the District Court was free to permit the jury to consider the unsettled state of the law in determining whether Kirtsaeng's conduct was willful,[48] we can find no binding authority for the proposition that it was required to do so.[49]  Furthermore, Kirtsaeng was provided ample opportunity to introduce evidence at trial and to argue to the jury that his internet research had led him to believe that his conduct was not unlawful. Accordingly, we cannot conclude that the District Court plainly erred in declining to give Kirtsaeng's proposed instruction.

---

[46] *Jarvis v. Ford Motor Co.*, 283 F.3d 33, 57 (2d Cir. 2002) (quotation marks omitted); *see also* Fed. R. Civ. P. 51.

[47] *Lavin-McEleny v. Marist Coll.*, 239 F.3d 476, 483 (2d Cir. 2001).

[48] *See N.A.S. Import, Corp. v. Chenson Enters., Inc.*, 968 F.2d 250, 252 (2d Cir. 1992) (holding that infringement is "willful" for the purpose of awarding enhanced statutory damages only if the defendant had "knowledge that [his] actions constitute[d] an infringement" or if the defendant exhibited "reckless disregard of the copyright holder's rights" (quotation marks omitted)); *cf. LNC Invs., Inc. v. First Fid. Bank, N.A.*, 173 F.3d 454, 468 (2d Cir. 1999) (holding that the jury was properly instructed to consider the unsettled state of the law in determining whether the defendants' actions were prudent).

[49] *But cf., e.g., Hearst Corp. v. Stark*, 639 F. Supp. 970, 980 (N.D. Cal. 1986) (holding that there could be no finding of willful copyright infringement as a matter of law where the wrongfulness of the defendant's actions depended on an unsettled question of law).

**C. The District Court did not err in allowing into evidence the amount of defendant's gross revenues.**

Kirtsaeng argues that admission of evidence regarding his gross revenues prejudiced him by confusing the jury as to the amount of damages that should have been awarded to Wiley. He suggests that the majority of his revenues came from the sale of other publishers' used volumes, many of which were produced in the United States, and claims that because of the evidence of revenues that the judge permitted to be presented to the jury, he was inappropriately forced to pay high statutory damages.

To determine whether evidence of the amount of defendant's gross revenues was properly admitted, ordinarily we first determine the appropriate standard of review. As stated above, where a party does not contemporaneously object to an evidentiary ruling, that party must demonstrate that the District Court committed "plain error."[50] However, even if a proper objection was asserted in a timely fashion, we accord "considerable deference to a district court's decision to admit . . . evidence" pursuant to Federal Rule of Evidence 403(b)[51] and will reverse a district court's evidentiary ruling only if it constitutes an abuse of discretion.[52] When we review a district court's "judgment regarding the admissibility of a particular piece of evidence under [Federal Rule of Evidence] 403, we generally maximize its probative value and minimize its prejudicial effect."[53] Here, however, we need not reach the question of whether Kirtsaeng's counsel properly objected to the admission of evidence regarding his gross revenues because we hold that admission of the evidence by the District Court was not error or an abuse of discretion, and certainly not plain error.

---

[50] Fed. R. Civ. P. 51(d)(2).

[51] *SEC v. DiBella*, 587 F.3d 553, 571 (2d Cir. 2009) (quotation marks omitted). Rule 403(b) provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403(b).

[52] *DiBella*, 587 F.3d at 571; *cf. Sims v. Blot*, 534 F.3d 117, 132 (2d Cir. 2008) (explaining the term of art "abuse of discretion").

[53] *United States v. Downing*, 297 F.3d 52, 59 (2d Cir. 2002) (quotation marks omitted).

19

At trial, the jury awarded $75,000 in statutory damages per copyrighted work for Kirtsaeng's willful infringement of eight works. Under the relevant statutory provision, 17 U.S.C. § 504(c), *see* note 10, *ante*, the jury could have awarded damages of up to $150,000 per copyrighted work. Because abundant evidence was available to support the jury's finding of willfulness, the admission of information about Kirtsaeng's revenues was not prejudicial—that is, the jury could have imposed the same amount of damages without knowledge of Kirstaeng's revenues. For example, the books in question clearly stated the following:

> This book is authorized for sale [in a foreign region] only and may not be exported out of this region. Exportation from or importation of this book to another region without the Publisher's authorization, is illegal and is a violation of the Publisher's rights. The Publisher may take legal action to enforce its rights. The Publisher may recover damages and costs, including but not limited to lost profits and attorney's fees, in the event legal action is required.

In these circumstances, it does not seem anomalous or extraordinary that the jury made the findings it did, and we see no reason to conclude that the District Court's decision was improper under Rule 403(b).

### **CONCLUSION**

To summarize, we hold that (1) the first sale doctrine does not apply to works manufactured outside of the United States; (2) the District Court did not err in declining to instruct the jury regarding the unsettled state of the first sale doctrine; and (3) the District Court did not err in admitting evidence of Kirtsaeng's gross revenues.

Accordingly, the judgment of the District Court is **AFFIRMED**.

J. GARVAN MURTHA, *District Judge*, dissenting:

As noted by the majority, the application of the first sale doctrine when a copy is manufactured outside the United States is an issue of first impression in this Circuit. The Supreme Court has recently considered the issue but unfortunately provided no specific guidance. See Costco Wholesale Corp. v. Omega, S.A., 131 S. Ct. 565 (2010), aff'g by an equally divided court 541 F.3d 982 (9th Cir. 2008) (holding the first sale doctrine does not apply to foreign manufactured copies unless previously imported and sold with the copyright holder's authorization). Unlike the majority, I conclude the first sale defense should apply to a copy of a work that enjoys United States copyright protection wherever manufactured. Accordingly, I respectfully dissent.

The Copyright Act sections that are pertinent to this appeal -- 17 U.S.C. §§ 106(3), 109(a), and 602(a)(1) -- are set out in the opinion of the majority. The distribution right of § 106(3) primarily protects a copyright owner's ability to control the terms on which her work enters the market. The first sale doctrine of § 109(a) limits the scope of this distribution right. Finally, § 602(a)(1) addresses the extent to which the distribution right allows a copyright owner to also control importation of copies of her work

The Supreme Court has held a copyright owner's § 602(a) right to control the importation of copies of her work is derivative of § 106(3)'s distribution right, which is subject to the first sale doctrine. Quality King Distrib., Inc. v. L'Anza Research Int'l, Inc., 523 U.S. 135, 149 (1998). The Court noted "the text of § 602(a) itself unambiguously states that the prohibited importation is an infringement of the exclusive distribution right 'under section 106, actionable under section 501.'" Id. Because the rights granted in § 106(3) are "subject to sections 107

1

through 122," the copyright owner's power to limit importation is qualified by the first sale doctrine of § 109(a). Id. at 144.

The issue is whether this holding can be extended to copies manufactured outside the United States. The Quality King Court held the first sale doctrine applies to imported copies that were made in the United States. Here, the district court held -- and the majority affirms -- the doctrine does not apply to imported copies that were made abroad because § 109(a) applies only to copies that are "lawfully made under this title," and that means physically manufactured in the United States. See John Wiley & Sons, Inc. v. Kirtsaeng, No. 08 Civ 7834, 2009 WL 3364037, at *9 (S.D.N.Y. Oct. 19, 2009). The court's decision is based on the following dicta in Quality King:

> Even in the absence of a market allocation agreement between, for example, a publisher of the United States edition and a publisher of the British edition of the same work, each such publisher could make lawful copies. If the author of the work gave the exclusive United States distribution rights-enforceable under the Act-to the publisher of the United States edition and the exclusive British distribution rights to the publisher of the British edition, however, presumably only those made by the publisher of the United States edition would be 'lawfully made under this title' within the meaning of § 109(a). The first sale doctrine would not provide the publisher of the British edition who decided to sell in the American market with a defense to an action under § 602(a) . . . .

523 U.S. at 148 (footnote omitted).

I respectfully disagree with the court's analysis. To apply, § 109(a) requires (1) the person claiming protection be the owner of the copy, and (2) the copy was "lawfully made under this title." 17 U.S.C. § 109(a). Courts have split over the meaning of "lawfully made under this title," with some holding it means "legally manufactured . . . within the United States," CBS v. Scorpio Music Distrib., 569 F. Supp. 47, 49 (E.D. Pa. 1983), aff'd without opinion, 738 F.2d 424 (3d Cir. 1984); see also Omega S.A. v. Costco Wholesale Corp., 541 F.3d 982, 987 (9th Cir.

2

2008), aff'd by an equally divided court 131 S. Ct. 565 (2010), and others "confess[ing] some uneasiness with this construction" and suggesting "lawfully made under this title" refers not to the place a copy is manufactured but to the lawfulness of its manufacture as a function of U.S. copyright law. Sebastian Int'l, Inc. v. Consumer Contacts (PTY) Ltd., 847 F.2d 1093, 1098 n.1 (3rd Cir. 1988).

The statutory text does not refer to a place of manufacture: It focuses on whether a particular copy was manufactured lawfully under title 17 of the United States Code. 17 U.S.C. § 109(a). The United States law of copyrights is contained in title 17. Accordingly, the lawfulness of the manufacture of a particular copy should be judged by U.S. copyright law. Pearson Educ. v. Liu, 656 F. Supp. 2d 407, 412 (S.D.N.Y. 2009) (John Wiley & Sons, Inc. was a plaintiff in this action as well). A U.S. copyright owner may make her own copies or authorize another to do so. 17 U.S.C. § 106(1). Thus, regardless of place of manufacture, a copy authorized by the U.S. rightsholder is lawful under U.S. copyright law. Here, Wiley, the U.S. copyright holder, authorized its subsidiary to manufacture the copies abroad, which were purchased and then imported into the United States.

This interpretation of "lawfully made" is supported by the language of the Copyright Act as a whole. For example, Congress used the phrase "under this title" in multiple sections of the Act to describe the scope of rights created by the Act. See, e.g., 17 U.S.C. § 104(a) (providing certain works, "while unpublished, are subject to protection under this title without regard to the nationality or domicile of the author"); id. § 105 (providing "copyright protection under this title is not available for any work" of the U.S. government); id. § 106 (providing "the owner of copyright under this title has the exclusive rights to . . . ."). However, "[w]hen Congress considered the place of manufacture to be important, . . . the statutory language clearly expresses

that concern." Sebastian, 847 F.2d at 1098 n.1. For example, § 601(a), the "manufacturing requirement," provides:

> Prior to July 1, 1986, and except as provided by subsection (b), the importation into or public distribution in the United States of copies of a work consisting preponderantly of nondramatic literary material that is in the English language and is protected under this title is prohibited unless the portions consisting of such material have been manufactured in the United States or Canada.

17 U.S.C. § 601(a)(1) (emphasis added). Also, as the majority points out, § 104(b)(2) provides "[t]he works specified by sections 102 and 103, when published, are subject to protection under this title if the work is first published in the United States or in a foreign nation . . . ." 17 U.S.C. § 104(b)(2) (emphasis added). If Congress intended § 109(a) to apply only to copies manufactured in the United States, it could have stated "lawfully manufactured in the United States under this title." As Congress did not include "manufactured in the United States" in § 109(a), though it was clearly capable of doing so as demonstrated by § 601(a), the omission supports the conclusion that Congress did not intend the language "lawfully manufactured under this title" to limit application of § 109(a) to only copies manufactured in the United States.[1]

As noted in the majority opinion, supra note 14, the first sale doctrine originated in Bobbs-Merrill Co. v. Straus, 210 U.S. 339 (1908). There the Supreme Court held defendant-retailer's sales of a copyrighted book for less than the price noted on the copyright page was not a copyright violation. Id. at 341. "The purchaser of a book, once sold by authority of the owner of the copyright, may sell it again, although he could not publish a new edition of it." Bobbs-

---

[1] Congress also demonstrated it could differentiate based on the place a copy was "acquired," see § 602(a) (applying to copies "acquired outside the United States"), further supporting the conclusion that its omission of a phrase indicating the place of manufacture was not accidental.

4

_Merrill_, 210 U.S. at 350. Once the copyright holder has controlled the terms on which the work enters the market, i.e., the purpose of the distribution right, "the policy favoring a copyright monopoly for authors gives way to the policy opposing restraints of trade and restraints on alienation." _Pearson_, 656 F. Supp. 2d at 410 (citation and quotation marks omitted). Accordingly, the _Bobbs-Merrill_ Court held the copyright owner did not have the right to control the terms of subsequent sales. 210 U.S. at 351.

The common law policy against restraints on trade and alienation is not limited by the place of manufacture. _Pearson_, 656 F. Supp. 2d at 413. Under the 1909 (codifying the _Bobbs-Merrill_ holding) and 1947 Copyright Acts, the first sale doctrine applied to "_any_ copy of a copyrighted work the _possession of which has been lawfully obtained_." Pub. L. No. 60-349, 35 Stat. 1075, 1084 (1909); Pub. L. No. 80-281, 61 Stat. 652, 660 (1947) (emphasis added). The Supreme Court noted "[t]here is no reason to assume Congress intended either § 109(a) or the earlier codifications of the doctrine to limit its broad scope." _Quality King_, 523 U.S. at 152. The changed wording in the current version of § 109(a) -- "lawfully made under this title" -- from the prior versions -- "possession of which has been lawfully obtained" -- should likewise not be presumed to do so.

Economic justifications also support applicability of the first sale doctrine to foreign made copies. Granting a copyright holder unlimited power to control all commercial activities involving copies of her work would create high transaction costs and lead to uncertainty in the secondary market. An owner first would have to determine the origin of the copy -- either domestic or foreign -- before she could sell it. If it were foreign made and the first sale doctrine

5

does not apply to such copies, she would need to receive permission from the copyright holder.[2] See 17 U.S.C. § 106(3). Such a result would provide greater copyright protection to copies manufactured abroad than those manufactured domestically: Once a domestic copy has been sold, no matter where the sale occurred, the copyright holder's right to control its distribution is exhausted. I do not believe Congress intended to provide an incentive for U.S. copyright holders to manufacture copies of their work abroad.

The Ninth Circuit has attempted to circumvent this perpetual right when a copy is made abroad by holding the first sale doctrine can apply to copies made outside the United States but only after there has been one authorized sale here. Denbicare U.S.A. Inc. v. Toys R Us, Inc., 84 F.3d 1143, 1150 (9th Cir. 1996). This precedent carried over into the reasoning in Omega S.A. 541 F.3d at 986-90. The Supreme Court, however, provided no guidance as to its views on the Ninth Circuit's imperfect solution, which is judicially created. This interpretation finds no support in the statutory text and is in direct conflict with the portion of the Supreme Court's Quality King decision which noted that where a sale occurs is irrelevant for first sale purposes. See 523 U.S. at 145.

Supporters of limiting the application of the first sale doctrine to domestically manufactured copies rely on the argument that applying the doctrine to foreign made copies

---

[2] Wiley argues its interpretation of § 109(a) would not lead to perpetual control over imported works because once the U.S. copyright owner imports its copies into the United States, they are lawfully within the United States and, as § 602 applies only to "importations without the authority of the copyright owner," any further sales would not be covered. Appellee's Br. at 24-25. This argument is not persuasive because the copyright holder seeking to prevent its copies from entering the United States retains exclusive control no matter how many foreign sales may have been made. Wiley's rule allows it to protect the disparity in its pricing structure despite free market forces. Indeed such a rule, by differentiating based on place of manufacture, would encourage the manufacturing of copies abroad to the detriment of American workers.

6

would render § 602(a) "virtually meaningless." (Appellee's Br. at 15-17.) However, § 602(a) will always apply to copies of a work that have not been sold or are piratical copies. It also applies to copies of a work not lawfully manufactured under title 17 but lawfully manufactured under some other source of law, as in the Quality King dicta, and to copies not in the possession of the "owner," e.g., a bailee, licensee, consignee or one whose possession of the copy was unlawful. Quality King, 523 U.S. at 147-48. Further, § 602(a) itself states unauthorized importation is an infringement of the exclusive distribution right of § 106, which as noted above is subject to the first sale doctrine of § 109(a).

Nothing in § 109(a) or the history, purposes, and policies of the first sale doctrine limits it to copies of a work manufactured in the United States. That leaves the question whether the Quality King dicta "sp[eaks] directly to whether the first sale doctrine applies to copies manufactured abroad." Pearson, 656 F. Supp. 2d at 414. That dicta, however, makes no reference to the place of manufacture, Quality King, 523 U.S. at 148, and therefore does not speak directly to the issue of applicability of the doctrine to foreign made copies.[3] Further, the dicta states the first sale doctrine would not provide a defense to the publisher who sold copies in the American market. Quality King, 523 U.S. at 148. Of course, because in that situation there has been no first sale unlike here, where the issue is whether the first sale doctrine is available as a defense to the subsequent purchaser.

---

[3] The Amici argue, based on the discussion at oral argument of Quality King, the Court was actually discussing the situation where the copy is made -- presumably abroad, but could be domestically -- by someone other than the U.S. copyright holder, for example, a British copyright holder who manufactures under British law. Entm't Merch. Assoc. Amici Br. at 10-12.

7

In Quality King, Justice Ginsburg, in a concurrence joined by no other justice, noted: "I join the Court's opinion recognizing that we do not today resolve cases in which the allegedly infringing imports were manufactured abroad." Quality King, 523 U.S. at 154 (Ginsburg, J., concurring). That issue, however, was squarely before the Supreme Court in Omega and four justices presumably did not agree the Quality King dicta directly addresses it or constitutes the Court's current view. In light of the above analysis, I agree with the majority that it is a "close call," supra p. 19, and I would conclude the first sale doctrine applies to foreign manufactured copies.

For the foregoing reasons, I respectfully dissent.