# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 13-60157

United States Court of Appeals
Fifth Circuit

**FILED**
May 6, 2014

Lyle W. Cayce
Clerk

SEALED PETITIONER, also known as J.T.,

Petitioner

v.

SEALED RESPONDENT,

Respondent

Petitions for Review of an Order of the
Board of Immigration Appeals

Before BARKSDALE, CLEMENT, and OWEN, Circuit Judges.

PER CURIAM:*

Sealed Petitioner ("J.T.") challenges various rulings by the Board of Immigration Appeals. Sealed Respondent ("the government") has moved to dismiss the petitions for lack of jurisdiction. For the reasons that follow, we DENY J.T.'s petitions for review and the government's motion to dismiss.

## FACTS AND PROCEEDINGS

J.T. came to the United States as a lawful permanent resident in 1987. In February 2011, he was detained by Immigration and Customs Enforcement and served with a Notice to Appear ("NOA") charging him as removable under

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1227(a)(2)(A)(iii), for having been convicted of an aggravated felony for the purposes of 8 U.S.C. § 1101(a)(43)(F) and § 1101(a)(43)(G).[1]

J.T. appeared pro se before an immigration judge ("IJ") and admitted to the allegations made against him in the NOA. The IJ found him removable as charged. Thereafter, J.T. filed an application for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"), contending that he would be tortured upon return to Jamaica because he was gay.

Following a hearing, the IJ denied J.T.'s requests for relief. In relevant part, the IJ found that: (1) his application for asylum was untimely because he entered the United States in 1987 but did not apply for asylum until 2011; (2) his New York state conviction was a "particularly serious crime," rendering him ineligible for withholding of removal under either the INA or the CAT; and (3) he had not met his burden of establishing that he would more likely than not be tortured upon being returned to Jamaica.

J.T. appealed the decision to the Board of Immigration Appeals ("BIA"), arguing that the IJ erred in finding that he had not established the likelihood that he would be tortured due to his homosexuality. Specifically, he cited a recent Ninth Circuit decision, *Bromfield v. Mukasey*, 543 F.3d 1071 (9th Cir. 2008), as establishing that it was likely that a gay man would be tortured upon being returned to Jamaica. He also appealed the IJ's determination that his robbery conviction was a "particularly serious crime."

---

[1] J.T. was convicted in June 2008 in New York of robbery in the third degree. He was given an indeterminate sentence of 2 1/3–7 years of imprisonment. Upon the recommendation of the sentencing judge, J.T. instead underwent the "shock program," an alternative rehabilitative regimen. He was released in 2010.

The BIA dismissed J.T.'s appeal. It found that the IJ properly decided that he was statutorily ineligible for asylum due to the lateness of his filing, which he did not challenge on appeal. It also affirmed the IJ's determination that his aggravated felony conviction rendered him statutorily ineligible for withholding of removal. Regarding J.T.'s claim for deferral of removal under the CAT, the BIA addressed the Ninth Circuit's holding in *Bromfield*, but upheld the IJ's determination that the record evidence did not support J.T.'s claim that it was more likely than not that he would be tortured in Jamaica because he was gay. Because he had the burden of making such a showing, the BIA held that the IJ correctly found him ineligible for deferral of removal.

In March 2013, J.T. filed a motion to reconsider, reopen, and remand his proceedings. In support of his motion, J.T. included as new evidence an expert declaration by a Jamaican attorney and human rights activist, as well as an August 2012 report on human rights in Jamaica. The BIA denied the motion. It held J.T.'s motion for reconsideration untimely under 8 C.F.R. § 1003.2(b)(2). Addressing his motion to reopen, the BIA determined that J.T. did not show that the new evidence would change the result in his case. The new evidence discussed discrimination and harassment against gays in Jamaica, which the BIA held "shed[] little, if any, light" on the "narrow issue" of whether J.T. "established that it is more *likely than not* that he would be *tortured* if sent back to Jamaica."

J.T. petitions this court to review the BIA's decisions. On March 21, 2013, the government filed a motion to dismiss his petitions for lack of jurisdiction. That same day, a motions panel ordered that the motion to

dismiss be carried with the case. It also denied J.T.'s motion for stay of deportation pending review.[2]

## STANDARD OF REVIEW

In a petition for review of a BIA decision, this court reviews legal and constitutional issues de novo. *Enriquez-Gutierrez v. Holder*, 612 F.3d 400, 406 (5th Cir. 2010). Although "we generally only have authority to review the BIA's decision, . . . we may also review the IJ's decision when it has some impact on the BIA's decision, as when the BIA has adopted all or part of the IJ's reasoning." *Id.* at 407; *see also Orellana-Monson v. Holder*, 685 F.3d 511, 517 (5th Cir. 2012) ("We review only the BIA's decision, 'unless the IJ's decision has some impact on the BIA's decision.'").

This court reviews denials of motions to reopen and to reconsider for abuse of discretion. *See Larin-Ulloa v. Gonzales*, 462 F.3d 456, 461 (5th Cir. 2006) (motion to reopen); *Guevara v. Gonzales*, 450 F.3d 173, 175 (5th Cir. 2006) (motion to reconsider). "Although we review the BIA's denial of a motion to reopen for abuse of discretion, a denial based on an error of law constitutes an abuse of discretion, and we review the BIA's resolution of questions of law de novo." *Larin-Ulloa*, 462 F.3d at 461. When determining legal error in a BIA decision, "[c]ommon sense as well as the weight of authority requires that we determine whether the BIA *applied* the correct legal standard, not simply whether it *stated* the correct legal standard." *Alvarado de Rodriguez v. Holder*, 585 F.3d 227, 235 (5th Cir. 2009) (quoting *Kabba v. Mukasey*, 530 F.3d 1239, 1245 (10th Cir. 2008)).

---

[2] J.T. filed a second motion for reconsideration challenging the BIA's denial of his original motion as untimely. At the time J.T. filed his petitions with this court, the BIA had not ruled on this motion, and we do not address the issue here.

## DISCUSSION

J.T. argues that the BIA committed reversible error because (1) it failed to consider the Jamaican government's acquiescence in the torture of gay men and applied the wrong torture standard; (2) its denial of his application for deferral of removal under the CAT was "arbitrary and capricious" under § 706(2)(A) of the Administrative Procedure Act ("APA"); and (3) it incorrectly held that his prior conviction was a per se particularly serious crime, rendering him statutorily ineligible for withholding of removal. The government challenges this court's jurisdiction to hear J.T.'s petitions. We address each issue in turn, beginning with the government's motion to dismiss.

I. Motion to Dismiss

On March 21, 2013, the government filed a motion to dismiss J.T.'s petition for review of the determination that he be removed under 8 U.S.C. § 1227(a)(2)(A)(iii) as an alien convicted of an aggravated felony. It argues that "[t]he Court lacks jurisdiction over the petition for review under 8 U.S.C. § 1252(a)(2)(C) because [J.T.] was ordered removed for having been convicted of an aggravated felony and he raises no constitutional or legal issues." We disagree.

"[N]o court shall have jurisdiction to review any final order of removal against an alien who is removable by reason of having committed" certain felonies, including aggravated felonies. 8 U.S.C. § 1252(a)(2)(C). But this court has jurisdiction to consider legal and constitutional questions raised in a petition for review. *Brieva-Perez v. Gonzales*, 482 F.3d 356, 359 (5th Cir. 2007).

Addressing this distinction, the government argues that J.T. raises neither constitutional claims nor questions of law "because, at bottom, he merely disagrees with a factual determination of the agency." In support of

this characterization, it cites this court's recent holding in *Escudero-Arciniega v. Holder*, 702 F.3d 781 (5th Cir. 2012). The *Escudero-Arciniega* court stated:

> Finally, we address Escudero's claims regarding his application for asylum, withholding of removal, and protection under the CAT. We conclude that the BIA correctly determined that Escudero was statutorily precluded from receiving asylum, because he was indeed convicted of an aggravated felony . . . . Because we uphold this determination, we lack jurisdiction to review any of Escudero's remaining claims. None relates to a legal or constitutional issue. Aside from his arguments regarding the aggravated felony conviction, Escudero asserts only factual issues on appeal, contending that he met his burden of proof before the IJ. Because we do not have jurisdiction to review factual determinations made pursuant to removal orders based upon an aggravated felony, we dismiss Escudero's petition for review of the BIA's denial of asylum, withholding, and protection under the CAT.

*Id.* at 785 (internal citations omitted).

In response, J.T. argues that he is not challenging the BIA's factual determinations, but instead "raise[s] legal questions pertaining to the BIA and the IJ's interpretation and application of eligibility and relief standards for the purposes of CAT and withholding of removal." The legal questions are: (1) whether the BIA's decision violated § 706(2)(A) of the APA; (2) whether he was convicted of a per se particularly serious crime; and (3) whether the BIA's denials of relief rested on legal errors, in particular "its failure to articulate a standard of 'torture' and its apparent reading of 'torture' to not include acts of violence."

We hold that because J.T. bases his claims for relief not on the IJ's and BIA's factual determinations but instead on three carefully framed and discrete legal questions, we have jurisdiction to address the issues raised in his petitions for review. Accordingly, the government's motion to dismiss for lack of jurisdiction is denied.

II. Acquiescence and the Standard for Torture

J.T. argues that the BIA's dismissal of his CAT application was error because it failed to consider government acquiescence to torture by private actors and to apply the correct standard for what constitutes "torture." We hold that neither the IJ nor the BIA committed the errors J.T. alleges.

Article 3 of the CAT provides: "No State Party shall expel, return ("refouler") or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture." Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, art. III, Dec. 10, 1984, 1465 U.N.T.S. 85. The federal regulation implementing the CAT defines torture as follows:

> Torture is defined as any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

8 C.F.R. § 208.18(a)(1).

This court has held that "relief under the Convention Against Torture requires a two part analysis—first, is it more likely than not that the alien will be tortured upon return to his homeland; and second, is there sufficient state action involved in that torture." *Tamara-Gomez v. Gonzales*, 447 F.3d 343, 350–51 (5th Cir. 2006) (footnotes omitted).

A. Government Acquiescence

J.T. claims that "[n]either of the BIA's decisions . . . nor the underlying IJ decision considered whether the Jamaican government acquiesces in the

torture of gay men by private actors as the regulations require." By failing to consider acquiescence, J.T. asserts that the BIA applied the incorrect standard for torture, warranting remand.

While it is true that the BIA's failure to consider acquiescence would warrant remand, *see Hakim v. Holder*, 628 F.3d 151, 156–57 (5th Cir. 2010), a review of the record reveals that this did not occur in the proceedings below. In its initial review of the IJ's decision, the BIA specifically mentioned the possibility that torture could come in the form of government acquiescence:

> Finally, we agree with the Immigration Judge that the respondent has not met his burden of establishing that it is more likely than not he will be subject to torture that is "inflicted by or at the instigation of *or with the consent or acquiescence* of a public official or other person acting in an official capacity. . . ."

The BIA further addressed the Ninth Circuit's holding in *Bromfield*, stating that "the record before it in that case established that the Jamaican government is both involved in the torture of gay men, *and acquiesces* in torture of gay men by others," and noting that "the Ninth Circuit's holding is nevertheless relevant, given the similarities between *Bromfield* and the respondent's claim." Given that the *Bromfield* decision focused almost entirely on acquiescence,[3] it is apparent that the BIA in this discussion evaluated the possibility of government officials in Jamaica acquiescing in torture.

The BIA's ruling noted that the *Bromfield* court "remanded the matter to the Board to determine whether the respondent had met his burden of establishing that such torture would be more likely than not in his case." It then affirmed the IJ's ruling that J.T. did not meet his burden of demonstrating

---

[3] "Bromfield was not required to show that the government would torture him; he could satisfy his burden by showing that the government acquiesces in torture of gay men. 'Acquiescence' requires only that public officials were aware of the torture but 'remained willfully blind to it, or simply stood by because of their inability or unwillingness to oppose it.'" *Bromfield*, 543 F.3d at 1079 (internal citation omitted).

that he would be tortured due to his sexuality. It credited the IJ's observation, among others, that the 2011 Country Report for Jamaica did not indicate that gays were frequently detained despite homosexuality being illegal in the country.

The record does not support J.T.'s characterization of the proceedings below. The BIA correctly acknowledged that government acquiescence would constitute torture for CAT purposes. It denied J.T. relief because he did not establish that *he himself* would more likely than not be subjected to torture upon returning to Jamaica.

B. Torture Standard

J.T. similarly argues that "the IJ and BIA . . . committed legal error with respect to the overall torture standard by concluding that the 'mistreatment [of gay men in Jamaica], while deplorable, did not constitute torture,' without articulating a standard against which this conclusion was drawn." He supports this contention by focusing on parts of the decisions that, according to him, show that both the IJ and BIA erroneously concluded that acts of violence towards gay men in Jamaica did not constitute torture for CAT purposes. J.T. points to a recent BIA determination that "the situation in Jamaica involves more than isolated instances of discrimination or harassment based on homophobic societal attitudes in Jamaica," and instead constituted "targeted violence by private and government officials on account of their sexual orientation." He claims that, in contrast, "the IJ and the BIA [here] appear to have adopted an incorrect standard of torture to conclude that the same acts of violence described in the country reports and evidence supplied by [J.T.] somehow do not constitute torture."

J.T. fails to demonstrate that either the IJ or BIA failed to identify or apply the correct standard for torture. Citing to 8 C.F.R. § 1208.18(a)(1), the

IJ correctly defined torture as "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person." And although it did not itself describe the contours of what constitutes torture, the BIA in its decision cited 8 C.F.R. § 1208.18(a)(1)–(5), the governing federal regulations. Both the IJ and BIA thus stated the correct legal standard for torture.

J.T. is correct that it is not enough for the BIA to state the correct legal standard; it must apply it as well. *See Alvarado de Rodriguez*, 585 F.3d at 235. But the record does not support his argument that the IJ and BIA misapplied the legal standard for torture to exclude acts of violence.

Addressing a 2011 Country Report, the IJ noted that "the Jamaican police were apparently involved in 12 cases of harassment or physical abuse against sexual minorities," but that "[t]he Country Report does not indicate that there have been specific reports of torture, although there were a number of reports of violence against homosexual inmates perpetrated by both the wardens and other inmates." It continued that "[w]hile homosexuality is punishable by law in Jamaica, the Country Report does not indicate that homosexuals are frequently detained by authorities simply for being homosexual or that those who are detained are subjected to conduct amounting to torture, which must rise to the level of cruel, inhuman, or degrading treatment or punishment." A fair reading of the decision's analysis is that the IJ, while acknowledging that some acts of violence can amount to torture, found that the evidence before him did not establish torture as opposed to acts of violence and misconduct that fall short of torture.

A review of the Country Report itself confirms the IJ's analysis. According to the report: "The Jamaica Forum for Lesbians, All Sexuals, and Gays (J-FLAG) continued to report serious human rights abuses, including assault with deadly weapons, 'corrective rape' of women accused of being

lesbians, arbitrary detention, mob attacks, stabbings, harassment of gay and lesbian patients by hospital and prison staff, and targeted shootings of such persons." Aside from the "harassment of gay and lesbian patients by hospital and prison staff," the report does not identify how any of the above-described acts were perpetrated or acquiesced to by the government. Although the report notes that "Police often did not investigate such incidents," it does not describe whether the failure to investigate in most cases was purposeful and because of the victims' sexuality. And while the report also mentions two sexually-motivated killings, it does not identify who the murderers were, whether they were affiliated in any way with the government, or the government's involvement or acquiescence in them.

We hold that the IJ and BIA correctly stated and applied the proper definition of torture for the purposes of J.T.'s CAT claim. Their analysis of the evidence before them was consistent with an understanding that torture encompasses both governmental acquiescence and certain acts of violence.

III. APA § 706(2)(A)

J.T. argues that the BIA's decision was "arbitrary and capricious," and thus in violation of § 706(2)(A) of the APA. We deny his petition for review on this issue because § 706(2)(A) does not apply to individual hearings under the INA.

J.T. claims that the decisions were arbitrary and capricious because (1) "the BIA plainly ignored its own recent decisions that granted CAT relief to gay Jamaican applicants with virtually identical factual records as [J.T.'s] case, and did so without explanation," and (2) "the BIA[] 'entirely failed to consider an important aspect' of [J.T.'s] case when it omitted the acquiescence prong from its evaluation of [J.T.'s] CAT claim."

11

Under the APA, a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). But the APA does not apply to the BIA's individual proceedings under the INA. "Congress intended the provisions of the Immigration and Nationality Act of 1952 . . . to supplant the APA in immigration proceedings." *Ardestani v. I.N.S.*, 502 U.S. 129, 133 (1991); *see also id.* at 134 ("it is clear that Ardestani's deportation proceeding was not subject to the APA"); *Rivera-Cruz v. I.N.S.*, 948 F.2d 962, 967 n.5 (5th Cir. 1991) ("We have recognized the Supreme Court's determination that the APA does not apply to deportation hearings under the INA."); *Hodge v. U.S. Dep't of Justice*, 929 F.2d 153, 155 n.2 (5th Cir. 1991) ("[W]e cannot conclude that the Supreme Court intended to leave open the possibility that the APA would 'govern' deportation proceedings.").

J.T. cites *Judulang v. Holder*, 132 S. Ct. 476 (2011), for the proposition that "[t]he Supreme Court recently authorized review of BIA decisions under APA's 'arbitrary and capricious' standard." But *Judulang* did not review an individual adjudication under the APA. Rather, it reviewed a BIA *policy*. *Id.* at 479 ("This case concerns the Board of Immigration Appeals' (BIA or Board) policy for deciding when resident aliens may apply to the Attorney General for relief from deportation under a now-repealed provision of the immigration laws."). J.T. cites to no other authority (and cannot) for the proposition that this court may review his individual immigration proceeding under § 706(2)(A). Because APA § 706(2)(A) does not apply to individual adjudications under the INA, we deny J.T.'s petition for review on this issue.

IV. Particularly Serious Crime

J.T. challenges the BIA's finding that his New York conviction was per se a particularly serious crime. This finding barred J.T.'s eligibility for withholding of removal under 8 U.S.C. § 1231(b)(3) and relief under the CAT. We hold that the BIA correctly found J.T.'s crime of conviction to be a particularly serious crime for the purposes of withholding of removal and the CAT.

For withholding of removal, "the Attorney General may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A). But this provision does not apply if "the alien, having been convicted by a final judgment of a particularly serious crime is a danger to the community of the United States." 8 U.S.C. § 1231(b)(3)(B)(ii). And "[f]or the purposes of clause (ii), an alien who has been convicted of an aggravated felony (or felonies) for which the alien has been sentenced to an aggregate term of imprisonment of at least 5 years shall be considered to have committed a particularly serious crime." 8 U.S.C. § 1231(b)(3)(B)(iv).

As a result of his conviction, J.T. was sentenced to an indeterminate term of 2 1/3–7 years imprisonment. The BIA held that, pursuant to § 1231(b)(3)(B)(iv), this was a sentence "to an aggregate term of imprisonment of at least 5 years" and thus a particularly serious crime.

J.T. argues that the BIA erred by neglecting to analyze New York indeterminate sentences according to New York law, and by finding his conviction to be per se a particularly serious crime based solely on the upper bound of his indeterminate sentence. He cites to various authorities for the propositions that, at times, (1) New York courts use indeterminate sentences to achieve a specific term of imprisonment and, (2) the New York legislature

places great importance on the *minimum term* of an indeterminate sentence in its sentencing statutes. As a result, J.T. argues that indeterminate sentences imposed in New York cannot be understood solely in terms of the maximum sentenced term.

His arguments cannot overcome the weight of authorities holding that sentences for an indeterminate term are considered to be sentences for the maximum period specified or allowed. In *Pichardo v. I.N.S.*, this court held that "[f]or purposes of exclusion and deportation proceedings, an indeterminate sentence is to be considered a sentence for the maximum term imposed." 104 F.3d 756, 759 (5th Cir. 1997). And while J.T. argues that *Pichardo* "does not bind the Court" because it did not involve a state sentence where the applicable state law may not equate indeterminate sentences with the maximum term, ample New York authority suggests that New York courts would take the same approach. In *United States v. Galicia-Delgado*, the Second Circuit considered an indeterminate sentence for attempted robbery under New York law and noted that "for more than a century, sentences for variable or unspecified periods have been treated as sentences for the maximum period specified or, if unspecified, the maximum permissible under the pertinent penal statute." 130 F.3d 518, 520 (2d Cir. 1997). New York courts have held likewise. *See People v. Washington*, 191 N.E. 7, 8 (N.Y. 1934) ("An indeterminate sentence is regarded as a sentence for the maximum term prescribed."); *People v. Morales*, 386 N.Y.S.2d 737, 739 (Sup. Ct. 1976) ("In New York, indeterminate sentences have long been regarded as a sentence for the maximum term.").[4]

---

[4] In *Shaya v. Holder*, the Sixth Circuit held that "in Michigan, 'the term of imprisonment' is not the maximum term served, but whichever is longer of the minimum sentence applied and the time actually served." 586 F.3d 401, 408 (6th Cir. 2009). But *Shaya* looked at how Michigan courts treat indeterminate sentences, not New York courts. The Eleventh Circuit recently noted that "*Shaya* confronted Michigan's idiosyncratic sentencing scheme, which

Under *Pichardo* and New York law, an indeterminate sentence is considered a sentence for the maximum term imposed. As such, J.T.'s sentence was for a term longer than five years, rendering him statutorily ineligible for withholding of removal and CAT protection. We therefore hold that the BIA did not err in finding that J.T.'s New York robbery conviction was a particularly serious crime, and deny his petition for review on this issue.[5]

## CONCLUSION

For the foregoing reasons, we DENY J.T.'s petitions for review and the government's motion to dismiss.

---

denied the state courts discretion in setting the maximum term for an indeterminate sentence and instead obligated the courts to set the maximum penalty provided by the law as the maximum term." *Cole v. U.S. Att'y Gen.*, 712 F.3d 517, 531 (11th Cir. 2013). *Shaya*'s analysis cannot apply to New York, whose courts have repeatedly stated that indeterminate sentences are treated as sentences for the maximum term.

[5] As his final issue on appeal, J.T. argues that the BIA abused its discretion in denying his motion to reconsider and/or reopen his appeal because of its "errors of law." Because we do not find any errors in the BIA's decisions, we deny his petition for review on this point as well.